J. S. SKINNER, Jr., etc., et al., Plaintiffs-Appellees,

v.

W. Bruce WHITE, A. Lamar Reid, etc., Jefferson National Equities, et al., Defendants-Appellants.

No. 73-2695.

United States Court of Appeals, Fifth Circuit.

Dec. 23, 1974.

---

L. Murray Alley, Jos. F. Johnston, W. S. Starnes, Birmingham, Ala., for defendants-appellants.

James L. Shores, Jr., Charles E. Clark, Birmingham, Ala., for Jefferson Memory Co.

James E. Clark, Birmingham, Ala., for St. Sec. Life Ins. Co.

William B. Hairston, Jr., Birmingham, Ala., for Cumberland Capital.

To Eric Embry, Clifford Reeves, Stanford J. Skinner, Birmingham, Ala., for plaintiffs-appellees.

Before GODBOLD and MORGAN, Circuit Judges, and BOOTLE, District Judge.

LEWIS R. MORGAN, Circuit Judge:

This appeal is from a judgment of contempt and the attendant sanctions entered against defendants-appellants. The underlying facts are intensely complicated, but will be presented summarily since the issues on appeal concern only the contempt proceeding itself. For reasons stated below, we reverse the judgment of the district court.

The initial complaint was filed on November 1, 1968, by appellee J. S. Skinner, Jr., on behalf of himself and all other owners of interment rights in two cemeteries. The named defendants were W. Bruce White, A. Lamar Reid, Jefferson National Equities Corporation (hereafter "Equities"), Jefferson Memory Corporation (hereafter "Memory"), and certain other corporations not involved in this appeal. State Security Life Insurance Company (hereafter "State Security") was later joined as a defendant. State Security, the owner of

the real property on which the two cemeteries are located, is a publicly held life insurance company. Memory, a subsidiary of Equities, owns 420,000 shares of State Security stock, and prior to the suit operated the cemetery under a management contract with State Security. Memory was the beneficiary of four trusts created to fund the maintenance and care of the cemeteries; White, Reid, and Clarence Bishop, Jr., were directors of Memory. At the time the suit was instituted, Reid was also trustee of the four trusts. The gravamen of the complaint was mismanagement and diversion of assets from the four trusts.

Defendants denied several of the allegations and raised affirmative defenses, but extensive discovery delayed trial for almost three years. On October 18, 1971, upon commencement of the nonjury trial, the district judge announced that he had determined that the suit was maintainable as a class action. Rather than try the case, attorneys for all parties then engaged in three days of settlement negotiations, apparently hoping to produce a mutually acceptable monetary judgment sufficient to fund the four trusts and pay plaintiff's attorney's fees and expenses. On October 21, after a brief hearing, the district judge entered findings of fact and conclusions of law. Among the more important provisions were the following:

(1) that Reid would be replaced as trustee by Exchange Security Bank, would turn over to the bank the trust assets, and would be excused from any further accounting;

(2) that since 1964, the assets of the four trusts had been diminished in value and that a contribution by Memory of $615,000 would adequately fund the trusts and cover plaintiff's attorney's fees;

(3) that one of Memory's chief assets, the 420,000 shares of State Security, was hypothecated for presently existing indebtedness;

(4) that in the event of a future hypothecation of Memory's State Security stock within five years of the date of the decree, Memory would immediately pay $50,000 to the trustee, and in the event of a sale of the stock during the five years, Memory would pay the sale proceeds up to $50,000 to the trustee;

(5) that the trust instruments would be amended to make the trustee subject to future control by the district court.

On November 15, 1972, Skinner petitioned the court to require appellants to show cause why they should not be held in contempt of court for having allegedly violated certain provisions of the 1971 decree. Four specific violations were alleged:

(1) that Equities, rather than Memory, had made the required $50,000 payment to the trustee upon the sale of part of Memory's State Security stock in October, 1972;

(2) that Memory had filed two law suits which "could substantially affect the effectuation of the decree in this case";

(3) that Memory had failed to make payments due under the decree;

(4) that Memory had failed to make semi-annual audit reports to the court and trustee as required by the trust instruments attached to the decree.

Shortly after the opening of the contempt hearing, on January 23, 1973, plaintiff's counsel made an announcement which dramatically altered the course of the proceedings and spawned the issues argued before this court. "Well, these two law suits will disclose some things," he said,

> . . . which were actions taken at the time that we were negotiating the decree in the case that constitute a fraud upon the court and upon the plaintiff in this case in the entering into of the decree which we say is a contempt of this court.

Over appellants' protests that they were unprepared to defend themselves against this charge, the court conducted a two-day hearing culminating in a judgment of contempt against appellants. The

court's judgment makes no reference to the four charges in appellee's petition; rather, it appears to rest on a finding of "fraud on the court" in negotiating the October, 1971, decree, and in diverting a portion of Memory's assets.

As instances of the first type of conduct, the court found that:

(1) The $350,000.00 loan of October 15, 1971 which was collateralized with the stock of State Security Life Insurance Company owned by Jefferson Memory Company was never disclosed to any attorney appearing before the Court in this matter prior to or at the time the decree of October 21, 1971, was entered;

(2) The decree of October 21, 1971, was obtained by fraud committed on this Court by Jefferson National Equities Corporation, State Security Life Insurance Company, A. Lamar Reid, and W. Bruce White. . . .

The diversion ruling was limited to one finding of fact:

The Court finds . . . a diversion and misapplication of assets of Jefferson Memory Company by W. Bruce White and A. Lamar Reid, which misapplication was aided and assisted by . . . State Security Life Insurance Company, and the Jefferson National Equities Corporation, each acting with knowledge of the actions and conduct of each of the others. The said diversion of assets, and the failure to disclose those diversions, constitute a fraud upon and contempt of this Court.

Among the many sanctions imposed by the court were the following:

(1) the unpaid balance ($470,245.34) of the judgment rendered against Memory in the October, 1971, decree was declared due immediately;

(2) White, Reid, Equities, and State Security were held liable to Memory for $468,408.00, the amount of Memory's assets found to have been diverted;

(3) a contract between Equities and State Security for the sale of 110,532 shares of Memory's State Security stock was made the property of Memory;

(4) a 1968 voting trust agreement governing Memory's State Security stock was "cancelled, abolished, and held to be null and void and of no effect";

(5) the debt of Richard V. Moore, President of State Security, to Equities and 58,976 shares of State Security stock pledged to secure the debt were declared to be the property of Memory;

(6) a lien was established on all Memory's assets in favor of Exchange Security Bank, the court-appointed trustee, for the amount of any present and future liability to "all purchasers of markers, merchandise, and prepaid interment services . . .";

(7) White and Reid were removed as directors and officers of Memory, and Equities was enjoined from voting its stock in Memory;

(8) Clarence E. Bishop, Jr., a director of Memory, was ordered to organize a non-profit corporation to perform the services previously performed by Memory, and State Security was ordered to negotiate a new cemetery management contract with the non-profit corporation.

Appellants' first contention is that the proceeding below failed to satisfy the most basic requirements of a valid contempt proceeding; it was impossible, they say, to determine whether they were being tried for civil or criminal contempt. In this contention we think they are clearly correct.

The essential distinctions between civil and criminal contempt are that:

(1) civil contempt lies for refusal to do a commanded act, while criminal contempt lies for doing some forbidden act;

(2) a judgment of civil contempt is conditional, and may be lifted if the con-

temnor purges himself of the contempt, while punishment for criminal contempt is unconditional;

(3) civil contempt is a facet of the original cause of action, while criminal contempt is a separate cause of action brought in the name of the United States;

(4) the notice for criminal contempt must indicate the criminal nature of the proceeding. Gompers v. Buck's Stove and Range Company, 221 U.S. 418, 441–445, 31 S.Ct. 492, 55 L.Ed. 797 (1911); De Parcq v. United States District Court for Southern District of Iowa, 235 F.2d 692, 699 (8th Cir. 1956), 11 Wright and Miller, Federal Practice and Procedure, § 2960 (1973).

■ The hearing below demonstrated traits of both criminal and civil contempt. For example, a charge of "fraud on the court," implies a direct insult of the court's dignity and authority, and therefore would seem to be in the nature of criminal contempt. Kienle v. Jewel Tea Company, 222 F.2d 98, 99 (7th Cir. 1955); Walling v. Crane, 158 F.2d 80, 83 (5th Cir. 1946).

A second indication of the criminal nature of the proceeding is that it did not possess one of the essential prerequisites of a civil contempt hearing: it was not predicated on disobedience of a prior court order. Boylan v. Detrio, 187 F.2d 375, 378–379 (5th Cir. 1951). As indicated above, the contempt judgment here rested on a finding of "fraud on the court," in (1) misrepresentation and non-disclosure in procurement of the October, 1971, decree, and (2) undisclosed diversions of Memory's assets. Neither of these findings was based on disobedience of a prior court order.

The nature of the sanctions is a third factor indicating that the proceeding could not have been civil. Clearly, some of the sanctions imposed by the district court would not terminate upon appellants' compliance with the terms of the decree. As this Court said in Lance v. Plummer, 353 F.2d 585, 592 (5th Cir. 1965):

> . . . since sanctions imposed in civil contempt proceedings must always give to the alleged contemnor the opportunity to bring himself into compliance [with the prior court order], the sanction cannot be one that does not come to an end when he repents his past conduct and purges himself.

*See also* International Business Machines Corp. v. United States, 493 F.2d 112, 115 (2nd Cir. 1973) wherein the court stated, "The hallmark of civil contempt is that the sanction imposed is only contingent and coercive."

Despite all this, the trial court seems to have viewed the proceeding as one for civil contempt, since it cited the Federal Rules of Civil Procedure as governing its conduct. Additionally, the sanctions were not imprisonment or a fine payable to the government, the only varieties of punishment permissible for criminal contempt under 18 U.S.C. § 402. Finally, the pleadings seem to assume that the contempt proceeding is a mere extension of the original action; plaintiff's attorneys, not the government, prosecuted the case in their client's name.

■ This mélange of civil and criminal traits prevents, even on appeal, a determination of the true character of the proceedings; obviously, the parties encountered at least as much difficulty in divining its nature while it was going on. We thus face a situation similar to that which we encountered in Clark v. Boynton, 362 F.2d 992, 994 (5th Cir. 1966) where we said:

> The simple fact is that no one, simply no one, is able to determine whether this was begun, tried, or ended as a case for criminal contempt, civil contempt, or both, or whether someplace down the trail, begun as one it was transmuted into the other. This is, of course, one thing about which there may not be any doubt if a contempt

order is to stand. Cliett v. Hammonds, 5 Cir., 1962, 305 F.2d 565.

For this reason alone, therefore, the district court judgment must be reversed. Even if we were to find, however, that the proceeding was clearly civil or criminal, the judgment would still have to be reversed, since the procedural requisites for either type of hearing were absent. Assuming the trial to have been criminal in nature, reversal would be mandated by the court's failure to follow the requirements of Federal Rule of Criminal Procedure 42(b) as to adequate notice.[1] Clark v. Boynton, 362 F.2d 992, 996 (5th Cir. 1966). Additionally, as noted above, the sanctions imposed were impermissible as part of a criminal contempt judgment.

■■■ Our assessment of the proceeding is similar if we assume that it was civil in nature. Pleading requirements of Rule 8, Federal Rules of Civil Procedure, were not satisfied, since the charge of "fraud on the court" was not made until after the hearing had begun. Additionally, the court adjudicated "diversion of assets" claims by Memory, claims which were extraneous in a hearing devoted solely to the issue of contempt. As noted above, civil contempt can rest only on contravention or disobedience of a prior court order, a situation not present here. Finally, because the sanctions imposed were not contingent on the alleged contemnor's failure to comply with the order, they exceeded the range of permissible civil contempt sanctions. Lance v. Plummer, 353 F.2d 585, 592 (5th Cir. 1965).

■■■ Appellants' second contention, that they had inadequate notice of the contempt charges, is likewise meritorious. As we have observed, appellees' show cause motion made no mention of the fraud on the court charge; rather, it was introduced for the first time during the hearing itself. This is constitutionally inadequate notice, violative of appellants' rights under the due process clause of the Fourteenth Amendment. The proposition that reasonable notice is one of the indispensable elements of due process requires no citation. And, of course, an alleged contemnor is entitled to the protection of the due process clause. Cooke v. United States, 267 U.S. 517, 537, 45 S.Ct. 390, 69 L.Ed. 767 (1925).

Here, appellants were prepared to answer, and did defend themselves against, the four charges in the original petition. Despite their protests that they had had no notice of the fraud on the court charge, they were required to proceed with a two-day hearing on this dangerously imprecise issue. Although what constitutes "reasonable" notice varies depending on the factual context, such vague, oral, untimely notice as occurred here is clearly not reasonable. See Matusow v. United States, 229 F.2d 335 (5th Cir. 1956); Philippe v. Window Glass Cutters League of America, 99 F. Supp. 369, 374–375 (W.D.Ark.1951). The Supreme Court long ago condemned the adjudication of contempt charges raised for the first time at the hearing itself. In Ex parte Bradley, 7 Wall. 364, 372–373, 19 L.Ed. 214 (1868), the court wrote:

The judges admit that the rule to show cause . . . called upon him

---

1. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order

of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment. Rule 42(b), Federal Rules of Criminal Procedure.

to answer simply for the act and conduct specified as for a contempt; yet they insist that, after the return of the [defendant attorney] to the rule in answering the contempt, they had a right in considering the answer, if any other offense appeared therein cognizable by the court, it was competent to take notice of it, and inflict punishment accordingly.

We cannot assent to this view. It assumes the broad proposition, that the attorney may be called upon to answer an offense specified and, when the answer comes in, without any further notice or opportunity of defense or explanation, punish him for another and distinct offense. Certainly no argument can be necessary to refute such a proposition. It violates the commonest and the most familiar principles of criminal jurisprudence.

Finally, fraud on the court is exactly the sort of serious, complex charge for the defense of which adequate preparation is most necessary; timely notice was not a mere formality here, but the key to appellants' ability to defend themselves. Two members of the bar were being called upon to defend themselves instantly against the charge that they had· perpetrated a fraud on a federal judge in a matter so factually complex that the judge himself admitted at the end of the hearing that it would be "difficult for most anyone  .   .   .    to get a complete grasp of [it]   .   .   .   in two days." Under these circumstances, appellants simply did not receive due process.

Appellants raise numerous objections to the district court's findings of fact. Because of the procedural inadequacies which precluded a fair and complete hearing, however, we need not consider whether these findings were correct.

For the reasons stated above, the order of the district court is reversed and the case is remanded.