Nicholas A. PALMIGIANO et al.

v.

J. Joseph GARRAHY et al.

Thomas R. ROSS et al.

v.

J. Joseph GARRAHY et al.

Civ. A. Nos. 74–172 and 75–032.

United States District Court,
D. Rhode Island.

March 28, 1978.

Robert B. Mann, Providence, R. I., Matthew L. Myers of the National Prison Project of the ACLU, Washington, D. C., for plaintiffs.

William G. Brody, Sp. Asst. Atty. Gen., Providence, R. I., Valentino Lombardi, R. I. Dept. of Corrections, Cranston, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

This matter is before the Court upon plaintiffs' motion that the defendant Department of Corrections be held in civil contempt for failure to comply with paragraphs 5(a) and 5(c) of the Court's Order of August 10, 1977, *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977).

After almost a decade of repeated and protracted litigation over the conditions at the Rhode Island Adult Correctional Institutions (ACI),[1] this Court found, in its Opinion of August 10, 1977, that conditions at the ACI constituted cruel and unusual punishment in violation of the Eighth Amendment.[2] It noted that the

> lack of sanitation, lighting, heating, and ventilation, and the noise, idleness, fear and violence, and the absence or inadequacy of programs of classification, education, physical exercise, vocational training or other constructive activity create a total environment where debilitation is inevitable, and which is unfit for human habitation and shocking to the conscience of a reasonably civilized person. *Palmigiano v. Garrahy*, at 979.

---

1. *See, e. g., Morris v. Travisono*, 310 F.Supp. 857 (D.R.I.1970); 373 F.Supp. 177 (D.R.I.1974), aff'd 509 F.2d 1358 (1st Cir. 1975); *Ben David v. Travisono*, 373 F.Supp. 177 (D.R.I.1974), aff'd, 495 F.2d 562 (1st Cir. 1974); *National Prisoners Reform Association v. Sharkey*, 347 F.Supp. 1234 (D.R.I.1972); *Souza v. Travisono*, 368 F.Supp. 959, *aff'd in part*, 498 F.2d 1120 (1st Cir. 1974).

2. This case arose as a consolidated class action brought by five prisoners confined in the Rhode Island Adult Correctional Institutions (ACI) and by the National Prisoners' Reform Association on behalf of all the prisoners incarcerated at the ACI. The plaintiff class, numbering over 650, includes pre-trial detainees as well as sentenced prisoners. Plaintiffs claimed that the conditions under which they were confined violated the Eighth and Fourteenth Amendments to the United States Constitution, as well as various provisions of state law. They sought broad injunctive relief, including the permanent closing of the maximum security building at the ACI complex in Cranston, Rhode Island. No damages were sought in this action.

Jurisdiction of this action, which arose under 42 U.S.C. § 1983, is conferred by 28 U.S.C. §§ 1343(3) and (4). The class was certified by order of July 23, 1976. Pendent jurisdiction was assumed over the state law claims.

In its Order of August 10, 1977 the Court therefore directed defendants to make significant changes in facilities and environment, classification of inmates, and educational and vocational program opportunities throughout the institution. The Court set out a timetable for meeting the various requirements of its Order and required defendants to report monthly on their progress towards achieving compliance.

Finally, the Court appointed Allen F. Breed, a nationally recognized expert in the field of corrections, to serve as its Special Master pursuant to Fed.R.Civ.P. 53. By the Court's Order of Reference dated October 27, 1977, the Master was charged with responsibility for reporting to the Court on defendants' efforts toward achieving compliance. He was authorized to consult with and advise defendants and to make appropriate recommendations to the Court regarding supplemental relief.

The specific issues presently before the Court involve the reclassification of the inmate population. In its original Opinion, the Court stressed the importance of reclassification to the entire prison program:

Classification is essential to the operation of an orderly and safe prison. It is a prerequisite for the rational allocation of whatever program opportunities exist within the institution. It enables the institution to gauge the proper custody level of an inmate, to identify the inmate's educational, vocational, and psychological needs, and to separate non-violent inmates from the more predatory. These goals are recognized by state law, which provides that classification shall serve a rehabilitative function. Classification is also indispensable for any coherent future planning. *Palmigiano v. Garrahy,* at 965. (footnote omitted)

Therefore, as part of the August 10 Order, the Court directed that:

5. (a) Defendants, not having classified prisoners according to state law, shall, within six months from the entry of this order, reclassify all prisoners in the Rhode Island penal system.

.  .  .  .  .

(c) Defendants shall, in the reclassification process, arrange for personal interviews of each prisoner and gather all pertinent information about each prisoner's community and institutional life, including, but not limited to, the following:

1. the age, offense, prior criminal record, vocational, educational and work needs, and physical and mental health care requirements of each inmate;

2. special needs arising from age, infirmity, psychological disturbance or mental retardation, requiring transfer to a more appropriate facility, or special treatment within the institution; and

3. eligibility for appropriate transfer to a pre-release, work-release, or other community-based facility.

Defendants were to have complied with this portion of the Order by February 10, 1978.

On February 6, 1978, pursuant to his Order of Reference, the Master held a hearing to determine whether defendants would comply with paragraphs 5(a) and 5(c) of the Order. Based on this hearing and his own expert observations, the Master submitted to this Court his Compliance Report of February 17, 1978, in which he made findings of fact, together with recommendations to defendants and the Court. The Master found that defendants had failed to reclassify the ACI population pursuant to the August 10 Order; furthermore, he found that they had no administrative or penological reasons for their noncompliance.

On March 10, 1978, plaintiffs moved that the Court hold defendants in civil contempt and apply contingent sanctions to enforce compliance with its Order. In its letter of March 13, 1978 to the parties, the Court directed the parties to appear before it on March 17, 1978, for two purposes:

1) To determine whether any of the findings of fact in the Master's Compliance Report of February 10, 1978 to which the defendants object are clearly erroneous, as provided by Rule 53(e)(2) of the Federal Rules of Civil Procedure; and

2) To hear oral argument on the plaintiffs' Motion for an Order to Show

Cause why the Defendants Should not be Held in Contempt for Failure to Comply with Paragraph 5(a)(c) of the Court's August 10, 1977 Order.

In preparing their testimony concerning any objections to the Master's report, the parties should be mindful that the usual rules of evidence will be applied and that the standard by which the Master's report will be judged is that of "clearly erroneous." Any evidence that was not presented to the Master will be admitted only upon a showing that the party offering it lacked a reasonable opportunity to offer the evidence at the hearing held by the Master on this subject on February 6, 1978.

Having taken testimony and heard argument, this Court will now address the adoption of the Master's Report and the motion for contempt with respect to defendants' noncompliance with paragraphs 5(a) and 5(c). The remaining issues raised in the Master's Compliance Report will be addressed in a further hearing on April 17, 1978.

## I. *Findings of Fact*

Fed.R.Civ.P. 53 directs a court in its treatment of a master's report. Rule 53(e)(2) states:

In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties . . . The court after hearing may adopt the report or may modify it in whole or in part or may receive further evidence or may recommit it with instructions.

While defendants filed no written objections, they proffered objections and testimony in the March 17th hearing. Defendants did not object to the Master's findings with regard to their failure to reclassify more than 37 inmates by February 10th. They did not offer evidence showing that they could not comply, did not know how to comply, or lacked resources to comply. They did, however, offer testimony in order to show that they had made good faith efforts to achieve compliance. This evidence focussed primarily on the efforts of the Governor's Implementation Team from August to December, when it ceased to function.[3]

We find this evidence tangential in response to the Master's Report. While the defendants demonstrated that the Gover-

---

**3.** The defendants did not challenge the Master's findings except that

1. They offered supplementary evidence for the purpose of casting a different view of certain findings regarding compliance between August and December which they acknowledged to be accurate. This evidence dealt with meetings held by the Governor's Implementation Team and their efforts to find a consultant. The Court has acknowledged the Team's efforts but found them unavailing and found no evidence that the Team instituted reclassification. Defendants offered no evidence contradicting the findings with regard to the Department of Corrections' lack of efforts, except to point to several meetings between the members of the Department and the Team.
2. They offered evidence suggesting that Mr. Black's duties, with regard to classification, were less broad than the Master suggested. This matter is of no consequence.
3. They asserted that in fact in the August to December period four persons in the Department of Corrections were formally charged with the task of providing information on classification to the Implementation Team and developing a plan. But they do not offer evidence to controvert the finding that no one in the Department was clearly and formally charged with responsibility and given power to implement reclassification, nor do they show that the work of these four for the Implementation Team produced concrete results.
4. They asserted that Mr. Sharkey was formally charged with the duty to reclassify, but the only evidence they submitted to controvert the finding that he had no actual authority was that he attended two meetings on classification.
5. Without evidence, they asserted that the Reclassification Board was an unimportant component in the classification process. But the Board has the statutory duty to review classification and we find the defendants' assertion incorrect.
6. Without evidence, they asserted that a reclassification consultant could not be found more quickly.

nor's Implementation Team responded with energy and dedication, they leave an unexplained hiatus between their energy and the uncontroverted facts detailed below, that the Implementation Team's efforts failed to achieve compliance.

We therefore accept the Master's Report as not clearly erroneous and, in fact, upon review of the testimony, we find it has ample support.

Based upon the Master's Report, the evidence adduced in his hearing and the evidence presented to this Court at the March 17 hearing, we find the following:

1. The Governor of Rhode Island, the Director of the Department of Corrections, and their agents are responsible for implementing subparagraph 5 of the Court's August 10 Order.

2. From August to December the Governor's Implementation Team was charged by the Governor with the responsibility of monitoring compliance with and implementation of the Court's Order. The Team was dismissed in December 1977.

A. *Degree of defendants' compliance as of February 10, 1978*

3. As of February 10, 1978, the defendants' reclassification process was divided in theory into four stages. Classification staff obtained information consisting of social histories, educational and psychological tests, criminal justice background, and institutional record for each inmate. The Classification Team, a group appointed from the Department of Corrections, consisted of a clinical psychologist, an educational specialist, and a correctional officer. It compiled information, interpreted the findings, and made recommendations concerning the inmate's program and security classification. The Team prepared a face sheet for each inmate, summarizing the information and recommendations, and one of the Team members presented the report to the Classification Board. The Classification Board, designated by statute (R.I. G.L. §§ 42–56–29, 30, 31), decided on the appropriate security classification and program for each inmate. Finally, the action of the Board was reviewed by the Director of the Department of Corrections or his designee.

4. As of February 6, 1978, only 37 out of more than 500 inmates had appeared before the Classification Board.

5. As of February 6, 1978, defendants had completed 289 social histories, 51 psychological tests, and 28 educational tests.

B. *Delay in Commencing the Reclassification Process Between August 10 and December 8, 1977*

6. From before August 10 to December 8, Robert Black, Chief of Classification Services for the Department of Corrections, was responsible for coordinating and overseeing the activities of the Classification Board.

7. Following the August 10 order, Black was not instructed to make any changes in operation of the Classification Board in response to this Court's Order.

8. Neither Black nor any other member of the Classification Board was given specific responsibility for carrying out the Court-ordered reclassification. According to Black's testimony, "the Board just continued business as usual." (Master's Hearing of February 10, Tr. at 89, hereinafter "Tr.")

9. The Classification Board continued to meet four or five times a week to fulfill its previously established functions of processing furlough and work-release applications and reviewing inmates' applications for changes in security status.

10. The Director of the Department of Corrections appointed John Sharkey on August 28 to serve as in-house director for all matters concerning classification. However, Mr. Sharkey was given no specific authority which would

have enabled him to carry out his function. Defendants presented no evidence of Mr. Sharkey's involvement with classification, other than his attendance at several meetings which were called by the Governor's Implementation Team.

11. On November 28, 1977, the Governor's Implementation Team requested that Mr. Sharkey be removed from his formal position as director of reclassification. The defendants complied with this request.

12. During the period from August 10 to December 8, 1977, Larry Kreis, Health Care Administrator for the Department of Corrections, participated in various meetings and activities during which classification was discussed. Kreis also provided assistance to the Governor's Implementation Team in coordinating the visit of a classification consultant on October 30 and gathering information for his use.

13. During this period, Kreis was given no responsibility for carrying out reclassification and therefore took no steps to supervise this process. According to Kreis' testimony, "I discussed [reclassification] with the chairman of the implementation team on a number of occasions, at his request. But I was not given any instructions to proceed and I didn't feel as if I had the authority to proceed without instructions." (Tr. at 76–77.)

14. On December 8, 1977, Larry Kreis was appointed to supervise the first three steps of the reclassification process, (see paragraph 3 *supra*): i. e., the preparatory phase of reclassification up to presentation of each case to the Classification Board.

15. During the period from August 10 to December 8, the Governor's Implementation Team devoted much time to discussing the goals of classification, deficiencies of the existing classification process, and the steps that were necessary to develop an effective classification system.

16. On October 14, 1977, the Governor's Implementation Team formally charged those individuals in the Department who were involved with classification, including Mr. Black, with the responsibility of developing a step-by-step description of each staff position and function necessary to carry out the reclassification.

17. The Governor's Implementation Team did not specifically instruct the members of the Classification Board to revise any of the procedures concerning reclassification or to establish any written criteria for the decision-making process. According to Mr. Black, the material developed by him pursuant to the Governor's Implementation Team's formal charge was turned over to the Implementation Team, and Black was not consulted again about the plans. (Tr. at 95.) (See paragraph 19, *infra*.)

18. The formal charge by the Governor's Implementation Team to the Department of Corrections did not require the Department to take any steps towards commencing the reclassification process. For all practical purposes, no one in the Department of Corrections was given responsibility and authority for supervising or carrying out the reclassification process during the period from August 10 to December 8, 1977.

19. Defendants have offered no explanation for their failure to hold appropriate personnel accountable for implementing the reclassification process or instructing them about their responsibilities, other than their own delay in hiring a classification consultant.

C. *Delay in Hiring the Classification Consultant*

20. The Governor's Implementation Team decided on August 23 that it would hire a classification consultant to help develop the classification process and oversee the activities of the Department of Corrections, pursuant to subparagraph 5(b).

21. The Governor's Implementation Team and the Department of Corrections staff determined that the classification consultant was essential to the commencement of the reclassification process, although the Court's Order does not require that the Department abate its reclassification duties imposed by state law prior to hiring a classification specialist.

22. Despite their view of the importance of the consultant, the defendants did not actually hire a classification consultant until mid-November. The consultant, Dr. Cowden, did not begin working with the Department on developing a reclassification system until December. Thus, the defendants took over one-half the time allotted for the reclassification process to hire and avail themselves of the services of a classification consultant.

23. Defendants offered evidence at the March 17 hearing to demonstrate the steps which the Governor's Implementation Team took to hire a consultant. However, the description of the Governor's Implementation Team's hiring process offered no reasonable explanation for the three-and-one-half month delay. The Court notes that the Special Master, a nationally known correctional expert who was given the responsibility for monitoring compliance with the entire Order, was hired in a month's time.

24. Defendants offered no explanation for their failure otherwise to respond to the Order before obtaining the services of a consultant (as required by 5(b)).

D. *Delay in the Hiring of Appropriate Staff to Carry Out Reclassification*

25. Defendants were informed of the necessity of developing basic information on inmates necessary for reclassification, and the need for staff to carry out that process, by their newly hired classification consultant Dr. Cowden, as well as by subparagraph 5(c) of the Court Order. In the proposed contract submitted by Dr. Cowden to defendants on November 5, 1977, he stated:

> I would suggest that as a necessary step in any reclassification procedure a number of employees should immediately begin going through these files to determine what information is lacking. Steps should then be taken to provide this information.

26. Dr. Brad Fisher (a clinical psychologist and formerly serving as the Assistant Director of the Prison Classification Project which reclassified all inmates in the Alabama Correctional System pursuant to the Order in *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala. 1976)), whose expertise was undisputed, testified that anyone familiar with the classification process would know that it is essential to gather basic social histories and educational tests in order to reclassify any inmate population.

27. In Dr. Cowden's proposed contract, he listed the type of information which defendants should gather, and stated that he would return to Rhode Island on December 5 (within two weeks), at which time he expected the defendants to have prepared at least 100 verified social histories.

28. As of December 5, 1977, only 17 verified social histories had been prepared.

Defendants have attempted to explain their failure to comply with the recommendations of the classification consultant by pointing to the refusal of some inmates to sigh waiver forms and to take the necessary tests. However, the Court concludes that the number of inmates who refused to sign waivers was not high enough to preclude the Department from completing the requisite number of social histories. Furthermore, defendants' witness testified at the Master's hearing that no testing was done until January "except for a number of tests administered on an experimental basis [by one of Cowden's assistants] to provide some vali-

dation for the testing process." (Tr. at 68.)

29. The Department was informed in November, by both the Governor's Implementation Team and Dr. Cowden, of the need for additional staff to carry out the reclassification process.

30. Despite the Department's knowledge of the need for additional staff, it allowed substantial delays before hiring necessary staff and giving them the specific responsibility of gathering the information necessary for reclassification.

31. Mr. Larry Kreis was not given responsibility for the reclassification process until December 8, 1977.

32. It was not until December 15 that defendants assigned 7 classification counselors to the task of developing social histories.

33. Five CETA workers were hired by the Department who reported to work on December 19. The Court recognizes that authorization for 5 CETA workers was informally obtained by members of the Governor's Implementation Team much earlier. However, the Department of Corrections did not submit the necessary paper work for these workers until some time in November. Thus, the reclassification process was not actually in operation until the staff was in place at the end of December.

34. The psychologist and psychometrist needed to perform the tests developed by Dr. Cowden were not hired until early January.

35. The Classification Team (as distinguished from the Classification Board) is a three-member committee that compiles the information gathered from social histories, psychological and educational tests, criminal justice records, and institutional records. It did not begin to operate until mid-January. Although the members of the Team—a clinical psychologist who would head the team, an educational specialist and a correctional officer— were appointed in early January, Mr. Kreis required two weeks to orient the Team to the classification process.

36. Thus, between August 10 and the middle of January no reclassification actually took place. (Master's Report at 12.) Between August and the middle of November, attempts were made to hire a classification consultant. Between November and December staff was hired, but during December and January no reclassification occurred.

37. Defendants have offered no reasonable explanation related to the availability of resources and personnel for not beginning the information-gathering process in a timely manner.

38. The Court finds that if data collection had begun promptly in August, as it could have, all data could have been collected as of February 6, 1978. It concludes this on the basis of its review of Dr. Brad Fisher's expert testimony (see paragraph 26 *supra*.)

39. In Alabama, pursuant to the Order in *Pugh v. Locke*, the Prison Classification Project took one week to hire and train the classification staff. The project completed the process of making classification recommendations for 3400 inmates in four-and-one-half months.

E. *Absence of Impact of the New Classification System on Reclassification*

40. Following the commencement of the reclassification process, the Classification Board continued to operate in the same manner as it had prior to the August 10 Order, although that procedure contributed to the constitutional violation found by this Court.

41. As of February 6, 1978, the criteria and classification process used by the Classification Board were the same as those used prior to the institution of the new system of information gathering (paragraph 3, *supra* ).

42. As of February 6, 1978, there were no specific written criteria used by the Classification Board in assigning inmates to maximum, medium, or minimum security levels.

43. As of February 6, 1978, all inmates were sent to the maximum security facility upon their entry to the ACI, a practice which is contrary to prison classification systems across the country.

44. The Master found and the Court agrees that written criteria are crucial for determining both appropriate security levels and program assignments.' This finding is supported by expert testimony that it is not possible to make consistent recommendations about classification without established written criteria. (Tr. at 139.)

45. Defendants have offered no reasons for failing to incorporate the information gathered through the efforts of the Classification Team into the reclassification process.

Larry Kreis testified that the Classification Board failed to attend meetings specifically intended to orient them to the reclassification process. Defendants offered no evidence that they were making reasonable efforts to coordinate the recommendations of the Classification Team with the decision-making responsibility of the Classification Board.

F. Reversal by Classification Board of Classification Team's Recommendations

46. By February 6, 1978 the Classification Board had completed 37 cases. Of the 37 cases, the Classification Team had recommended only 17 inmates for minimum status, three of whom had disciplinary "bookings" pending. Since the Classification Board will not recommend for minimum security anyone with bookings pending, only 14 of the 17 inmates were actually eligible for minimum security. Of the 14, only six were assigned by the Board to minimum security. This is a 57% rate of reversal of the Team's recommendations.

47. The Board has not given any written, explanations of its decisions to overturn the Team's recommendations.

This failure to set forth reasons is contrary to the advice of the Department of Corrections' own classification consultant, Dr. Cowden, who recommended that the Board be required to submit written explanations for the reversal of Team recommendations. Dr. Brad Fisher also testified at the Master's hearing concerning the importance of written explanations of Team reversals in order that inmates might understand the decisions concerning their classification.

G. Current Status of Reclassification

48. As of March 10, 1978, the Classification Board had reclassified 209 out of approximately 525 sentenced inmates at the ACI.

49. As of March 10, the Classification Team had prepared recommendations for 213 inmates, while 473 social histories have been completed.

H. Findings Regarding Compliance

50. The Court finds that the defendants have failed to comply with subparagraphs 5(a) and 5(c).

51. The classification process is fundamental to the August 10 Order and must be completed to enable compliance with the rest of the Order, notably subparagraphs 2(a) and 3(b).

52. Defendants have offered no sufficient reasons for their failure to comply with the Court's Order, related to the availability of resources (financial, personnel, expertise), or to their ignorance of the Order or of the method of complying with it.

II. The effects of the Failure to Reclassify

Reclassification of inmates at the ACI is the cornerstone of any attempt to amelio-

rate conditions at the institution. *Palmigiano v. Garrahy,* at 965. It is also central to the accomplishment of many specific changes envisioned by the Order.

The Court is dismayed at defendants' inability to perceive the potential for inmate abuse, degradation, and fear of violence and rape, which is perpetrated by the lack of proper classification. They have unnecessarily confined the majority of prisoners along with the few most violent and dangerous inmates, when the classification procedure would reveal that these inmates do not require maximum security. To these inmates the term "maximum security" is a painful irony, for it entails their incarceration under the most dangerous conditions. Moreover, the failure of reclassification inhibits the assignment of inmates to constructive vocational and educational activities. In the course of the trial in *Palmigiano,* the Court heard extensive testimony regarding the detrimental results of this practice:

> The testimony established overwhelmingly, and without contradiction, that the idleness suffered by inmates at the ACI was excessive, engendering fear and violence and causing psychological deterioration. Experts of broad experience found it worse than any they had ever encountered, and believed it to be a major, and inevitable, cause of the violence and consequent fear and terror which pervade the ACI.
>
> *Palmigiano,* at 981.

Thus the inadequacy of the classification process was, and is, a major contributing factor to the unconstitutional conditions at the ACI.

The Court also takes note of the continued financial burden which the people of Rhode Island must bear as a result of defendants' noncompliance. As the Master noted:

> The failure of the Department of Corrections to complete the reclassification process on schedule requires costly delays in facility planning, unfair and ineffective program assignment of inmates, and unnecessary daily expenditure of thousands of dollars because inmates are misclassified to maximum security when public safety does not require such an assignment.
>
> Compliance Report at 20.

Finally, the failure to reclassify under paragraph 5 significantly impedes the implementation of many other parts of the August 10 Order. Until reclassification is completed, defendants cannot redistribute the inmate population according to appropriate security designations, as required by paragraph 9 of the Order. Defendants are also unable to produce a final facilities configuration for the ACI, in compliance with paragraphs 2(a), 3(a), 3(b) and 10, until a reclassified population profile is completed. In addition, reclassification is essential to the development of vocational, educational, and recreational programs at the ACI, as provided for in paragraphs 5(3) and 9, since inmates cannot be assigned to appropriate programs without the benefit of recommendations from the Classification Team.

The failure to reclassify has such serious consequences; but the costs of reclassifying are not great. Reclassification is no unfamiliar duty to the defendants. It has been the responsibility of the Department to conduct a meaningful classification system under R.I.G.L. §§ 42–56–29, 30, 31, 32 (1976), since the Rhode Island legislature directed it to institute modern classification procedures. When the Court set out to fashion relief in *Palmigiano v. Garrahy,* it did no more with regard to classification than to enforce the duty already incumbent on defendants. In addition, paragraph 5 poses no significant financial or personnel burden on defendants. The burden is especially modest in comparison with the other provisions of the August 10 Order.

### III. *The Law of Contempt*

The plaintiffs have moved the Court for a finding of civil contempt for the defendants' failure to comply with the classification Order.

While criminal contempt aims at vindicating the dignity of the court,[4] civil contempt serves

> to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the Court has found them to be entitled. . . . [They] are civil, remedial, and coercive in their nature, and the parties chiefly interested in their conduct and prosecution are the individuals whose private rights and remedies they were instituted to protect or enforce
> . . .

*In re Nevitt,* 117 F. 448, 458 (8th Cir. 1902); *cf. United States v. United Mine Workers,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884.

In light of the interests to be protected by this remedy, civil contempt proceedings may be instituted only by a party seeking to enforce the court's remedy. *MacNeil v. United States,* 236 F.2d 149, 153 (1st Cir. 1956).

"Broadly speaking, a civil contempt is a failure of a litigant to do something ordered to be done by a court in a civil action for the benefit of the opposing party therein." *Walling v. Crane,* 158 F.2d 80, 83 (5th Cir. 1946). Since "wilfulness" is not an element of civil contempt, *McComb v. Jacksonville Paper Company,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *United States v. Greyhound Corporation,* 363 F.Supp. 525, 570 (N.D.Ill.1973), supplemented, 370 F.Supp. 881, aff'd, 508 F.2d 529, the defendants' intent is not in issue in this case. *Thompson v. Johnson,* 410 F.Supp. 633, 640 (E.D.Pa.1976); *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 S.Ct. 599 (1948).

The party against whom civil contempt sanctions are sought need not be held to absolute compliance with a court order. "Especially where the decree, as in this case, calls for elaborate and complex performance, a contempt adjudication is not required or justified merely because the results are found to be incomplete or postponed." *Aspira of New York v. Board of Education of City of New York,* 423 F.Supp. 647, 654 (S.D.N.Y.1976); *Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union,* 174 U.S. App.D.C. 285, 294, 531 F.2d 617, 626 (1976). Courts have conceived various standards of reasonableness in order to measure defendants' compliance in civil contempt proceedings. One court has described the standard as, "Whether defendants have been reasonably diligent and energetic in attempting to accomplish what was ordered", *Aspira of New York v. Board of Education of City of New York,* 423 F.Supp. at 654. Another asked whether defendants took "all the reasonable steps within their power to insure compliance with the orders", *Sekaquaptewa v. MacDonald,* 544 F.2d 396, 406 (9th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 550, 51 L.Ed.2d 774.

However, where the court determines that "defendants violated their obligations under the decree by failures of diligence, effective control, and steadfast purpose to effectuate the prescribed goals," contempt findings are in order. *Aspira,* 423 F.Supp. at 651; *cf. Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App. D.C. 312, 333, 510 F.2d 692, 713 (1975).

Plaintiffs seeking the application of civil contempt sanctions have usually been held to a burden of proving defendants' noncompliance by "clear and convincing" evidence, *United States v. Rizzo,* 539 F.2d

---

4. Criminal contempts are "those prosecuted to preserve the power and vindicate the dignity of the courts, and to punish for disobedience of their orders . . .. [They] are punitive in their nature, and the government, the courts, and the people are interested in their prosecution." *In re Nevitt,* 117 F. 448, 458 (8th Cir. 1902); *cf. United States v. United Mine Workers,* 330 U.S. 258, 302, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Gompers v. Bucks Stove and Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911). Thus, the court, not an adverse party, may institute criminal contempt proceedings upon its own motion. F.R.Cr.P. 42(b), when a violation of its orders constitutes an affront to its dignity and warrants punishment.

458, 465 (5th Cir. 1976); *Hart, Schaffner & Marx v. Alexander's Department Stores, Inc.,* 341 F.2d 101 (2nd Cir. 1965); *N.L.R.B. v. Alamo Express, Inc.,* 395 F.2d 481 (5th Cir. 1968). While defendants' inability to comply with a judicial decree has been accepted as a valid defense to civil contempt charges, *United States v. Bryan,* 339 U.S. 323, 330–334, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *N.L.R.B. v. Trans Ocean Export Packing, Inc.,* 473 F.2d 612, 616 (9th Cir. 1973), "the federal rule is that one petitioning for an adjudication of civil contempt does not have the burden of showing that the respondent has the capacity to comply. . . . The contrary burden is on the [defendant]." *N.L.R.B. v. Trans Ocean Export Packing, Inc.,* 473 F.2d at 616 (citations omitted); *Aspira,* 423 F.Supp. at 654.

## IV. *Finding of Contempt*

We have found that the defendants are not in compliance with the Order, that they have been out of compliance since February 10, 1978, and will in the immediate future remain out of compliance.

We have found further that there have been long periods in which no efforts to comply were made whatsoever and other periods when efforts to comply were limited. The defendants were dilatory. We have found also that none of the reasons offered for delay by defendants related to an inability to comply. The reasons offered did not relate to lack of notice, lack of money, lack of personnel, lack of expertise, or lack of legal power. To the contrary, the defendants had a pre-existing duty to classify inmates correctly. The August 10 Order came as no surprise and imposed no burdens which they could claim were unreasonable.

The history of defendants' efforts to achieve compliance with paragraph 5 contains repeated unwarranted delays. Thus, between August 10 and November 15 defendants' only effective response to the Court's Order was their search for a classification consultant. Even up to mid-December, defendants had failed to implement any changes in their classification staffing and procedure. Although some additional staff were assigned to classification by mid-December, no actual reclassification took place until January 19. By February 10, the court-ordered compliance date, only 37 of over 500 inmates had been reclassified.

Even after the Department's Classification Team began to produce biographical profiles on inmates, the Classification Board implemented no changes in conjunction with the Team's efforts until mid-February, even though Rhode Island law requires that the Board "review all studies of each prisoner", R.I.G.L. § 42–56–31 (1976). Thus, while the Classification Team produced extensive data and recommendations for each inmate, the Board failed to take advantage of its input; nor did it develop standard, written criteria with which to evaluate the Team's inmate profiles.

In the hearing of March 17, 1978, defendants tried to prove the adequacy of their efforts at compliance through testimony regarding the Governor's Implementation Team's work between August and December, 1977. While the Court recognizes the energy and dedication of the Team's members, their efforts did not constitute "all reasonable steps," *Sekaquaptewa,* 544 F.2d at 406, toward achieving compliance. Since no Team member had experience in correctional administration, defendants suffered an inordinate delay while the Team familiarized itself with relevant aspects of the Department's activities. Moreover, their efforts are not in issue here. At issue are the activities of the Department of Corrections.

The Implementation Team failed to achieve coordination with those officials of the Department of Corrections who had responsibility, pursuant to state statute and this Court's Order, for implementing the reclassification process. Nor were the planning efforts undertaken by the Team ever translated into specific directives to be followed by Departmental personnel.

In the hearing, the State's Assistant Attorney General attempted to justify the Department of Corrections' dilatory responses by pointing to the energy and good faith of

the Team, appointed by the Governor, to oversee implementation on his behalf. The Governor's good faith is without question and the energy of his Team has been commendable. But it has not produced results. It has been faced with the same frustrations as this Court—trying to persuade the Department of Corrections to fulfill its statutory and constitutional duties.

■ For these reasons, and because of the serious impact on the entire Order of the failure to comply, the Court is forced to conclude that defendants did not undertake all "reasonable and necessary" steps toward compliance with paragraph 5 of the August 10 Order. They are hereby adjudged in contempt. This action is one for civil contempt, not criminal. The Court has made no finding of bad faith or wilful intent to frustrate the August 10th mandate, and the Court has no intention of punishing defendants for their failure to achieve compliance.

Nevertheless the Court has concluded that a coercive sanction is necessary.

> The word "contempt" rings fiercely; if its connotations in law included only lay notions like scorn and wilful disobedience, plaintiffs could not prevail. But the idea in this context includes failures in meaningful respects to achieve substantial and diligent compliance. In this sufficient sense, the defendants are found to have been in contempt, and it has become the court's duty to declare it.

*Aspira,* 423 F.Supp. at 649.

## V. *The Sanction*

■ The State's Assistant Attorney General stated in Court, in the March 17th hearing, that the reclassification process would be complete by May 1, 1978, and that if it were not he understood a contempt sanction would be imposed. This Court takes him at his word and will impose a daily fine of $1,000.00 from and after May 1, 1978 for each day after May 1 that defendants are out of compliance. Defendants may purge themselves of contempt by achieving compliance with paragraphs 5(a) and 5(c) at any time before May 1, 1978. In that event this Court may quash this con-

tempt citation and revoke the fine. *Hamilton v. Love,* 358 F.Supp. 338, 348; 361 F.Supp. 1235 (D.Ark.1973).

The Court concludes that a fine is necessary because the Court's deference to the duly-appointed state officials has not persuaded the Department of Corrections that the August 10 Order must be complied with, with all the speed that the Department's resources permit. With regard to other parts of the Order, the defendants have been granted extensions when requested. But in this case they have come forward with no reasonable explanation of their failure to comply. At a Master's hearing on February 6, 1978, they said that classification would be completed by April 10. Yet defendants chose to revise that estimate before the Court, stating at the March 17 hearing, that the process would not be completed until May 1. While the Court recognizes that the Department has made progress since January, it can only conclude that the Department's goals may not be realized unless they are pursued under the threat of a coercive sanction.

In shaping the sanction, the Court has taken into account "the character and magnitude of the harm," "the probable effectiveness of the suggested sanction in bringing about the result desired" and "the amount of defendants' financial resources and the consequent seriousness of the burden to that particular defendant." *United States v. United Mine Workers,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947).

The Court's present purpose is coercive and not remedial and it makes the sanction conditional. *Cf. United Mine Workers,* 330 U.S. at 304, 67 S.Ct. 677; *Skinner v. White,* 505 F.2d 685, 690 (5th Cir. 1974); *Windsor Power House Coal Co. v. District 6, United Mine Workers of America,* 530 F.2d 312, 316–17 (4th Cir. 1976).

If the defendants fail to comply by May 1, then the fine shall be paid to the Court. *See Winner Corp. v. H. A. Caesar & Co.,* 511 F.2d 1010, 1015 (6th Cir. 1975). The Court will then consider making the sanction into

a remedial one, for the continuing constitutional detriment suffered by the prisoners. This Court may then look to the Pennsylvania Court of Common Pleas, in a conditions of confinement prison suit, which imposed a large fine on city officials and established a committee to spend the fine to improve the conditions of confinement of the prisoners.[5]

Reluctantly, the Court applies the present sanction against Mr. John Moran in his official capacity as Rhode Island's newly-appointed Director of the Department of Corrections.[6] The Court is aware that he had no role in defendants' compliance efforts prior to February 13, three days after the classification deadline had passed.

Nevertheless, in the Court's findings of fact the absence of a locus of responsibility for reclassification is made evident. Neither the Governor's Implementation Team, Mr. Larry Kreis, nor Mr. Robert Black had clear authority to respond to the Court's mandate, although each did have a limited role in the classification process. Because the Court cannot safely conclude that particular Departmental personnel, nor the Implementation Team were solely responsible for defendants' noncompliance, the Court has no other recourse than to direct its findings to the present head of the Department of Corrections.

The Court makes an additional order in conjunction with its finding of civil contempt, *see United States v. Greyhound Corp.,* 370 F.Supp. 881, 886 (N.D.Ill.1973). The Court directs John Moran, Director of the Department of Corrections, to identify within 10 days those officials under his authority who have responsibility for the reclassification process. Mr. Moran may comply with this Order by letter to the Court, which will specify the title, the detailed job description, and the position in the hierarchy of each job, and the name of the job-holder.

This is hardly the first time that state officials have been found in contempt of a federal court. *See, e. g., Morgan v. Kerrigan,* 401 F.Supp. 216 (D.Mass.1975), aff'd, 530 F.2d 401 (1st Cir. 1976), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976); *Aspira of New York v. Board of Education of City of New York,* 423 F.Supp. 647, 651–58 (S.D.N.Y.1976); *Hamilton v. Love,* 358 F.Supp. 338, 348; 361 F.Supp. 1235 (E.D.Ark.1973); *Hadnott v. Amos,* 325 F.Supp. 777 (M.D.Ala.1971); *In re Herndon,* 325 F.Supp. 779 (M.D.Ala. 1971); *Harvest v. Board of Public Instruction of Maratee Co. Fla.,* 312 F.Supp. 269, 276–282 (M.D.Fla.1970); *Meredith v. Fair,* 328 F.2d 586 (5th Cir. 1962); *cf. Aaron v. Cooper,* 156 F.Supp. 220 (E.D.Ark.1957), aff'd sub nom., *Faubus v. U. S.,* 254 F.2d 797 (8th Cir. 1958), *cert. denied,* 358 U.S. 829, 79 S.Ct. 49, 3 L.Ed.2d 68; *Holmes v. Danner,* 191 F.Supp. 394 (M.D.Ga.1961); *U. S. v. Wallace,* 222 F.Supp. 485 (M.D.Ala. 1963); *Lasky v. Quinlan,* 406 F.Supp. 265 (S.D.N.Y.1976); *Vecchione v. Wohlgemuth,* 426 F.Supp. 1297, 1316 (E.D.Penn.1977); *Richmond Black Police Officers v. City of Richmond, Va.,* 548 F.2d 123 (4th Cir. 1977).

Nonetheless, this Court has acted to hold an official of the State of Rhode Island in contempt with great reluctance and only after long patience with the deplorable conditions at the ACI and deference to defendants' good faith efforts. This litigation has gone on too long, in large part because of the failure of administration by the Department of Corrections, *see Palmigiano v. Garrahy,* at 977–978; *Jefferson v. Southworth,* 447 F.Supp. 179, 190–191 (D.R.I.1978). The Court insists that the intolerable conditions be ameliorated. Reclassification is an essential first step.

The Court is aware that the final burden of this fine will fall on the taxpayers of

---

5. The Pennsylvania Court of Common Pleas imposed a contempt fine of $75,000 damages and a $250,000 conditional fine on the Mayor, Commissioner of Public Welfare and other officials. *Jackson v. Hendrick,* 22 Crim.L.Rep. 2356–57, (Jan. 25, 1978); *cf. Id.* at 2356 (citations therein); *Hendrick v. Jackson,* 10 Pa. Cmwlth. 392, 309 A.2d 187 (1973), *aff'd in part, rev'd in part,* 457 Pa. 405, 321 A.2d 603 (1974).

6. *Cf. Parker v. United States,* 126 F.2d 370, 379 (1st Cir. 1942) (corporate officers). *But cf. Thompson v. Johnson,* 410 F.Supp. 633 (E.D. Pa.1976), *aff'd* 556 F.2d 568 (3rd Cir. 1977).

Rhode Island, if the defendants fail to use the next month to comply with the Court's Order. But already the heavy financial costs, which the prison administration imposes by maintaining many prisoners in unnecessarily high security, fall on the taxpayers; this cost should soon be diminished. The citizens of this state also bear the human costs of operating a degraded prison system, which is below minimum standards and does not afford rehabilitative opportunities for those who eventually will return to live among us.

No prison can be a happy or congenial place. Those in the public who fear and those among the prisoners who hope that this Court believes otherwise are mistaken. Rather, prisons require the highest dedication and discipline of a prison administration just to make them tolerable, for there is much in a prison to bring out the worst in everyone.

Whether cooperatively or coercively, this Court intends that the ACI become a tolerable prison, as the Constitution demands.