Robert Simpson RICCI, et al., Plaintiffs,

v.

Robert L. OKIN, M.D., et al., Defendants.

MASSACHUSETTS ASSOCIATION FOR RETARDED CITIZENS, INC., et al., Plaintiffs,

v.

Edward J. KING, et al., Defendants.

Thomas McEVOY, Jr., et al., Plaintiffs,

v.

Charles F. MAHONEY, et al., Defendants.

William GAUTHIER, et al., Plaintiffs,

v.

Charles F. MAHONEY, et al., Defendants.

MASSACHUSETTS ASSOCIATION FOR RETARDED CITIZENS, INC., et al., Plaintiffs,

v.

Edward J. KING, et al., Defendants.

Civ. A. Nos. 72–469–T, 75–5210–T, 74–2768–T, 75–3910–T and 75–5023–T.

United States District Court, D. Massachusetts.

April 21, 1982.

Carl Valvo and William Brown, Boston, Mass., for defendants.

Beryl Cohen, Boston, Mass., for plaintiffs in Ricci, et al., Gauthier, et al. and McEvoy, et al.

Nonnie S. Burnes, Boston, Mass., for plaintiffs in Mass. Assoc. for Retarded Citizens, et al. (both cases).

## TABLE OF CONTENTS

Introduction 819
I. Factual Background 819
II. The Personnel Decree 822
III. The Law 823
IV. The Defendants' Efforts at Compliance
 with the Personnel Decree 828
 A) The Proposed Reduction 830
 B) The Osborn Report 834
Conclusion 836
Appendix

## OPINION

TAURO, District Judge.

The immediate issue in this decade-old litigation concerns the level of staffing necessary to meet the requirements of the Final Decree on Personnel covering five state schools for the mentally retarded ("Personnel Decree").[1]

The Personal Decree is a consent decree, agreed to by the parties on July 10, 1978, and thereafter entered as an order of this court. Under its terms, the necessary level of staffing at the various state institutions is to be determined by agreement of the parties. Any impasse between the parties is to be brought to the court's attention for resolution.[2]

On July 22, 1981, defendants informed the court that, despite opposition from the plaintiffs, they intended to implement significant staffing reductions at each of the institutions.[3] Notwithstanding the clear language of paragraph 10 of the Personnel Decree, the defendants' original position was that they could implement staffing cuts over plaintiffs' objections and without court approval. After the issue was briefed and argued, the defendants conceded in open court that disputes between the parties concerning personnel are to be resolved by the court.

That concession brings into focus defendants' contention that a 408 person staff cut can be implemented without affecting consent decree compliance. The plaintiffs disagree. And so, as both parties now acknowledge, this court must determine what level of staffing is necessary to meet the requirements of the various controlling consent decrees.

To that end, the court held evidentiary hearings through the fall of 1981 and early part of 1982. The case was taken under advisement on March 12, 1982, following the filing of final memoranda by the parties.

## I

## FACTUAL BACKGROUND

In order to appreciate better the context and import of the issues involved, it is helpful to examine briefly the history of this litigation. A class action was filed in 1972 on behalf of the mentally retarded clients of the Belchertown State School. The basis of the action was plaintiffs' assertion that conditions at the school were so inadequate that they violated the residents' constitutional and statutory rights.[4] During the next three years, similar actions were filed on behalf of the clients at Fernald, Monson, Wrentham, and Dever. Named as defendants were various Commonwealth officials with direct and indirect responsibility for the operation of these institutions.[5]

1. The history of this litigation is outlined in Section I, *infra*. The first suit, challenging living and treatment conditions at Belchertown, was filed on February 7, 1972. Four additional suits concerning Fernald, Dever, Monson and Wrentham were filed later and then consolidated. After literally hundreds of hours of effort by the parties and the court, interim and final consent decrees covering these institutions were filed. These decrees were complemented by the filing of the Personnel Decree which is the immediate subject of this opinion.

2. Plaintiffs' Exh. 1, FINAL DECREE ON PERSONNEL AT THE FIVE STATE SCHOOLS FOR THE MENTALLY RETARDED, ¶ 10, states:

Prior to any decision to adjust staffing at any state school, the defendants agree to consult with the plaintiffs' counsel and to bring any disagreement to the attention of the court for its resolution.

3. The across-the-board cuts would have reduced personnel at the institutions by 408.

4. The complaints variously alleged deprivation of the plaintiffs' due process rights to minimally adequate care and treatment, and their rights under certain federal and Massachusetts statutes, including Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, and Mass.Gen.Laws ch. 19 and ch. 123. Although not cited in the complaints, Part 1, Article X of the Massachusetts constitution also provides that "[e]ach individual of the society has the right to be protected by it in the enjoyment of his life, liberty, and property, according to standing laws."

5. Certain officials of the Commonwealth who were originally named as defendants have left office since these suits were instituted. Their successors in office have been or are in the

Shortly after the institution of the Belchertown suit, this court took a day-long view of conditions there. Similar views were taken of the other institutions. Involved state and federal officials accompanied the court on these views. Many legislators, including the Speaker of the House of Representatives and the then chairman of the Senate Ways and Means Committee, accompanied the court on one or more views.

These views established beyond dispute that "a constitutional level of care [had] not been attained"[6] at these institutions and that conditions there were intolerable. Rather than defend the indefensible, the state defendants agreed to work with the plaintiffs and the court to fashion comprehensive remedial programs that would be memorialized in the form of consent decrees.

During the next several months, the individuals concerned devoted hundreds of hours of study, negotiation, and planning to crafting five interim consent decrees which "embod[ied] the parties' collective assessment of the needs of the clients at the five state schools and the appropriate means of meeting those needs."[7] The decrees were signed by various state officials, including then Governor Michael Dukakis[8] and Attorney General Francis X. Bellotti, at a hearing on July 25, 1977.

Along with the Governor and the Attorney General, the July 25, 1977 open court hearing was attended by Speaker McGee of the Massachusetts House of Representatives. The Speaker's presence prompted the following remarks by this court:

Mr. Speaker, you took the time to see the problem [of the state institutions for the retarded] for yourself. You took the

time out of a very, very busy schedule; and after doing so, you told me that the legislature would provide the funds necessary to properly care for our retarded citizens. Your exact words to me were, "If we can't take care of these people, we ought to fold up our tents and go home." You are a man of your word, and I commend you.[9]

Speaker McGee responded to the court's invitation to speak by stating,

I just really want to say that in my 15 years in the legislature, a commitment has always been there by the members of the legislature. If one just goes to any one of these institutions and looks at the children there, then I just think—as I just said to you—"If we can't take care of them, then we had better fold up our tents and go home."

And we are not ready to do to that. We are committed to the job that you want done; the people involved want done, and we'll do it.[10]

Speaker McGee's remarks left no room to doubt that the legislature of the Commonwealth, like the executive branch, was committed to providing care and treatment of the retarded in keeping with the mandate of the consent decrees and the laws and Constitution of the United States. The remarks of Attorney General Bellotti that day are telling in this regard. He said,

I made a policy decision with the Governor during the pendency of these cases to, shall we say, ameliorate the adversary system because we made a judgment that the level of care did not reach [a] constitutional level of care....

process of being substituted as named defendants. In addition to the superintendents at each of the institutions, the defendants include the Governor, the Secretary of Human Services and the Commissioner of Mental Health.

6. Transcript of the July 25, 1977 Hearing at p. 17 (statement of Attorney General Francis Bellotti).

7. Memorandum of this court, September 11, 1981, p. 2.

8. In January 1979, Mr. Dukakis was succeeded as Governor by Edward King. Governor King accompanied the court on a view of Fernald on July 27, 1979 and expressed publicly his support for full funding and implementation of the decrees.

9. Transcript of the July 25, 1977 Hearing at p. 12.

10. *Id.* at p. 16 (statement of Speaker McGee).

We cannot tell people what kind of care there should be, but we can say that a constitutional level of care has not been attained and that the case would be indefensible. We made that judgment. I merely made a policy decision. They [the parents of the retarded] did all the work with people from the State agencies, the Speaker, President of the Senate.[11]

No reasonable person could conclude that the fashioning and execution of these consent decrees were the result of collusion between plaintiffs and defendants, nor that the legislature's commitment to funding the decrees, as expounded by Speaker McGee, was anything but deliberate and substantive. Indeed, that fact is underscored by Attorney General Bellotti's final remarks at the July 25, 1977 hearing.

I think it is probably the classic example of where the good of the people overrides the adversary system: the cooperative effort among the Legislature, the Executive Branch, and the Judicial Branches of Government—and they were talking so much about separation of powers because I think of your [the court's] ability more than anything else to reach that fine line where there is still a separation, yet a cooperation—that we are able to have accomplished all these things.[12]

Although the consent decrees signed on July 25, 1977 contained provisions relating to personnel, a final decree outlining the personnel requirements for the five state institutions was not approved by this court until August 2, 1978. During the intervening year the parties conducted prolonged negotiations and attended innumerable meetings in an effort to hammer out the contours of a constitutionally and statutorily acceptable level of staffing.[13] The final version of the decree was the culmination of a thorough, complex, and cooperative process. That process included input from a variety of sources, including the superintendents of the various institutions, as well as guidance of professionals from the Massachusetts Departments of Mental Health and Public Health.

The result of this objective, bipartisan inquiry was an agreement among the parties that it was necessary to add a total of 2047 positions to the staffs of the five state schools. That agreement was formalized and implemented by the Personnel Decree signed on July 10, 1978.

Thereafter, the various consent decrees affecting these five institutions continued to receive actual and articulated support from leaders in both the executive and legislative branches. For example, at a September 1980 open court hearing concerning the status of the decrees, Senate Ways and Means Committee Chairman Atkins stated that "the legislature has always, without exception and without delay, responded to all claims made by this court for finances to put the state into compliance with the consent decrees."[14] Senator Atkins' counterpart in the House of Representatives, Ways and Means Committee Chairman Finnegan, was even more positive in his statement of support, declaring that "none of the intent of the consent decrees have ever been deviated from and they're not going to be."[15]

The staffing levels delineated in the Personnel Decree were based on a projection that the resident population at the subject institutions for the retarded would be 4700

---

11. *Id.* at pp. 17–18 (statement of Attorney General Francis Bellotti).

12. *Id.* at p. 18.

13. The transcript of this court's recent evidentiary hearing concerning personnel needs details the painstaking steps taken by all involved to develop a responsible Personnel Decree. Particularly enlightening is the Affidavit of Boisfeuillet Jones, Jr., former counsel to the Dever and Wrentham plaintiffs. Plaintiffs' Exh. 43, Affidavit of B. Jones, Jr. ¶ 7 (8/11/81). Mr. Jones' recollections are consistent with this court's own, and with the testimony of other individuals who participated in formulating the decree. Testimony of Linda Glenn, tr. 7–136 to 145 (12/2/81); Francis Kelley, tr. 1–27 to 28 (9/3/81); Ronald Rosen, tr. 1–1000 (9/3/81); Ellsworth Pearl, tr. 2–5 (9/4/81).

14. Transcript of the September 5, 1980 Hearing at pp. 38–39 (statement of Senator Atkins).

15. *Id.* at p. 51. Mr. Finnegan is now State Auditor.

as of July 19, 1978.[16] In their wisdom, however, the parties provided for flexibility in assessing staffing needs. They recognized that the population of any school might increase over the years, or decrease through attrition and appropriate community placements. And so, the Personnel Decree was drafted to provide for corresponding adjustments in staffing levels as the populations of the institutions either increased or decreased.[17] The parties themselves are charged with monitoring the changing population patterns. When the parties agree on current staffing needs, the defendants must implement appropriate staffing changes. In the event of a disagreement not resolvable by the parties, the Personnel Decree provides that they will bring such impasse ". . . to the attention of the court for its resolution." [18]

On June 26, 1981, the defendants notified the court that they intended to decrease the staffing levels at the state schools, and that the plaintiffs were not in agreement with the planned reductions. The parties filed a joint motion for a hearing on the defendants' plan. In response to an inquiry from the court, the defendants stated that they did not believe the court's approval was required before the adjustments could be instituted, despite the objections of the plaintiffs and the plain language of the decree. On July 27, 1981, therefore, this court issued an order temporarily restraining defendants from "implementing any plan for reduction of personnel at the state schools, either by imposing a hiring freeze or by terminating existing personnel." A hearing on plaintiffs' motion for a preliminary injunction was held on August 12, 1981. Rather than continuing to oppose the motion for a preliminary injunction, however, defendants agreed to maintain the existing level of personnel pending this court's determination as to the merits of their proposed reduction.

16. Plaintiffs' Exh. 1, PERSONNEL DECREE, ¶ 10.

17. *Id.*

18. *Id.*

19. *Id.* ¶ 2.

II

*The Personnel Decree*

The Personnel Decree is straightforward in its terms. It states,

[t]he defendants' continuing commitment under the terms of this Decree is to comply with the personnel standards for care and treatment set forth in Title XIX of the Social Security Act, 42 U.S.C. § 1396a, and regulations promulgated thereunder.[19]

It requires defendants to provide "direct care staff . . . deemed adequate by [the Department of Public Health] to meet each resident's needs as specified in individual service plans." [20] Under the terms of the decree, defendants are to engage in aggressive recruiting and training of personnel, and to use their best efforts to minimize vacancies and absenteeism by various means including salary increases and contracting of services.[21] The decree also makes explicit the parties' assumption that "direct-care staff should not perform support services, and that non-professional direct-care staff are competent to provide appropriate services to residents when adequately supervised." [22]

As noted earlier, the Personnel Decree provides for adjustments in staffing. If, for example, the resident population is reduced by transfers to community settings, the defendants are obligated to "shift resources" into those settings and "to provide adequate training programs for staff" assigned to the community placements.[23]

The Personnel Decree anticipates possible adjustments in staffing levels consistent with the needs of a reduced population. But no formula is provided for accomplishing that end. The Decree makes no refer-

20. *Id.*

21. *Id.* ¶ 7.

22. *Id.* ¶ 5.

23. *Id.* ¶ 10.

ence whatsoever to client-staff ratios. It contains no suggestion that a statistical, "ratio" adjustment would be an acceptable basis for determining future staffing levels. Indeed, the careful analyses and prolonged negotiations that preceded the entry of the Decree, and the extraordinary effort which went into development of its original requirements,[24] would make such a purely mathematical approach untenable. To the contrary, the Decree calls for careful, individualized analysis of each resident's needs. That requirement is underscored by its mandate that the defendants provide direct-care staffing "adequate ... to meet each resident's needs as specified in individual service plans."[25] Based on the evidence presented, the language of the Decree and the history of the negotiation process, the court determines that the parties did not intend to adopt a statistical, formulaic approach to assessing current staffing needs.

The Personnel Decree requires that the defendants "comply with the personnel standards for care and treatment set forth in Title XIX of the Social Security Act, 42 U.S.C. § 1396a, and regulations promulgated thereunder."[26] Title XIX in turn sets forth two conditions relevant here. First, residents of "intermediate care facilities," must be provided with "a written plan of service prior to admission." 42 U.S.C. § 1396a(a)(31)(A). Second, they must receive "active treatment." 42 U.S.C. § 1396d(d)(2).

The interim consent decrees, which incorporate the Personnel Decree, spell out these requirements in greater detail. The Wrentham decree,[27] for example, incorporates the Personnel Decree to the extent it applies to Wrentham residents. It requires defendants to furnish all clients with a written individual service plan[28]

which specifies in detail the individual's capabilities and needs for services, ... [including his] residential and program needs, vocational and work needs and capabilities, medical needs, psychological needs, equipment needs, guardianship needs, and habilitation needs as a whole, including all education, recreation, speech therapy, physical therapy, support services, and other services required by this Decree to meet the needs of the individual.[29]

The staff at Wrentham must be "sufficient ... to meet each individual's residential and program needs as specified in the individual service plan."[30] Thus under the terms of the decrees any diminution in personnel may not reduce the level of services below that which is required by Title XIX and the decrees themselves.

### III

### The Law

Consent decrees which are negotiated and agreed upon by litigants, and formally approved by the court, are binding orders that "have the same force and effect as any other judgment until set aside in the manner provided by law." *United States v. Kellum*, 523 F.2d 1284, 1287 (5th Cir. 1975). *See also Interdynamics v. Firma Wolf*, 653 F.2d 93, 96–97 (3rd Cir. 1981). An order incorporating a consent decree may be enforced by a motion either for civil contempt, *AMF Inc. v. International Fiberglass Co.*, 469 F.2d 1063 (1st Cir. 1972) or criminal contempt, *U. S. v. Schafer*, 600 F.2d 1251 (9th Cir. 1979).

Thus, although an order embodying a consent decree has some of the characteristics of a contract, it is more than simply an agreement between the parties.

---

24. *See* page 821, *supra* and Plaintiffs' Exh. 43, Affidavit of B. Jones, Jr. (8/11/81).

25. Plaintiffs' Exh. 1, PERSONNEL DECREE, ¶ 2.

26. *See* page 10, *supra*.

27. Plaintiffs' Exh. 7, Interim Consent Decree.

28. *Id.* ¶ 6.

29. *Id.*

30. Plaintiffs' Exh. 7, Interim Consent Decree (undated), ¶ 31. The four remaining consent decrees contain similar requirements. Dever Decree ¶ 6, ¶ 31; Belchertown Decree p. 10; Monson Decree ¶ 1, ¶ 4, ¶ 5; Fernald Decree ¶ 1.4, ¶ 6, ¶ 10.

[A consent] judgment is not an *inter partes* contract; the court is not properly a recorder of contracts, but is an organ of government constituted to make judicial decisions and when it has rendered a consent judgment it has made an adjudication.

1B Moore's *Federal Practice* ¶ 0.409[5], at 1030 (2d ed. 1982), *quoted in United States v. City of Miami, Florida*, 664 F.2d 435, 441 (5th Cir. 1981) (opinion of Rubin, J.). *See AMF Inc. v. International Fiberglass Co., supra*, at 1065.

The force and validity of a consent decree as a binding adjudication derives from the careful consideration given by the court to the constitutional and statutory policies underlying the settlement, and to the interests of all parties and the general public.

In assessing the propriety of giving judicial imprimatur to the consent decree, the court must also consider the nature of the litigation and the purposes to be served by the decree. If the suit seeks to enforce a statute, the decree must be consistent with the public objectives sought to be attained by Congress.... Voluntary compliance will frequently contribute significantly toward ultimate achievement of statutory goals.... Defendants "minimize costly litigation and adverse publicity and avoid the collateral effects of adjudicated guilt." *United States v. City of Jackson*, 519 F.2d [1147] at 1152 n.9. Therefore, willing compliance will be more readily generated by consent decrees than would mandates imposed at the end of bitter and protracted litigation.

*United States v. City of Miami, Florida, supra*, at 441–42.

 In public law litigation, the court must also satisfy itself that there has been no collusion among the parties and that all branches of government have had the opportunity to participate in the fashioning of the decree, and have evidenced support for them. In those instances, consent decrees carry with them "a presumption of validity that is overcome only if [they] contain[ ] provisions which are unreasonable, illegal,

unconstitutional, or against public policy." *United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir. 1980).

 Where a court gives careful consideration to the terms and effect of a decree before approving it, and the decree over time proves to be an effective device for remedying ongoing, persistent constitutional deprivation, its value should be preserved and its proper implementation insured by careful court monitoring. When proper compliance with the decrees becomes a disputed issue not resolvable in the ordinary course of court supervision, hearings may be necessary to determine whether compliance is possible and, if so, whether it has been accomplished.

 The court, in assessing efforts to comply with the decrees, should not apply inflexible, absolute standards, particularly where elaborate and complex performance is called for. But defendants fairly may be held to the requirement that they be "reasonably diligent and energetic in attempting to accomplish what was ordered." *Palmigiano v. Garrahy*, 448 F.Supp. 659, 670 (D.R.I.1978) (quoting *Aspira of New York v. Board of Education of City of New York*, 423 F.Supp. 647, 654 (S.D.N.Y.1976)). The test is "whether defendants took 'all the reasonable steps within their power to insure compliance with the orders.'" *Palmigiano v. Garrahy, supra*, quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977). Although a court may order a defendant to "do an impossibility, and then punish him for refusal to perform it," *Maggio v. Zeitz*, 333 U.S. 56, 59, 68 S.Ct. 401, 403, 92 L.Ed. 476 (1948) (quoting and vacating *sub nom. In re Luma Camera Service, Inc.*, 157 F.2d 951, 955 (2d Cir. 1946)), the burden is clearly on the defendant, where relief from the order is sought, to prove that he is unable to comply with it. *Palmigiano v. Garrahy, supra*, at 671.

 The requirement that parties to a consent decree take "all reasonable steps within their power," *Palmigiano v. Garrahy, supra*, at 670, to comply with its terms

applies with equal force to private and public litigants. State defendants, too, must demonstrate that they have made a good faith effort to comply with a consent decree in order for modification to be warranted. *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1120 (3rd Cir. 1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980).

■ A defendant who seeks modification of a consent decree must demonstrate that the dangers which the decree was designed to avert "have become attenuated to a shadow." *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). Thus, "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead [a court] to change what was decreed after years of litigation with the consent of all concerned." *Id.* Even in the case of decrees signed by state officials, the burden of demonstrating circumstances warranting modification, where "the defendants made a free, calculated, and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment . . . is perhaps . . . more formidable than had they litigated and lost." *Philadelphia Welfare Rights Organization, supra.*[31]

■ In this case, the consent decrees were negotiated and agreed upon by the parties, and formally approved by this court, after it considered thoroughly the constitutional and statutory bases of the decrees and their possible impact on the parties. All branches of the government participated in the fashioning of the decrees, and consistently have expressed support for them. No evidence exists of collusion that would call into question their validity. Effective as court orders, they constitute an adjudication that is binding and enforceable. *See* 1B Moore's *Federal Practice* ¶ 0.409[5], *supra; U. S. v. City of Miami, Florida, supra; AMF Inc. v. International Fiberglass Co., supra.*

This court has carefully monitored compliance with all of the consent decrees, with the assistance of personnel that the Commonwealth employs in an office established for that purpose. The immediate dispute surrounding the defendants' efforts to substantially diminish the staff of personnel employed at the schools requires this court to determine what level of staffing is required by the decrees, and the extent to which the proposed reduction undermines defendants' ability to comply with them.

The issues facing this court are distinguishable from those addressed by the Courts of Appeals for the Second and First Circuits, respectively, in recent cases involving disputes about compliance with consent decrees.

In *New York State Assoc. for Retarded Children v. Carey*, 631 F.2d 162 (2d Cir. 1980), the Second Circuit reversed the trial court's order adjudging the Governor of New York in contempt of a consent judgment which, *inter alia*, required him to "take all actions necessary to secure implementation of the steps, standards and procedures contained in [the] judgment . . . [and to] . . . take all steps necessary to ensure the full and timely financing of this judgment, including, if necessary, submission of appropriate budget requests. . . ." *Id.* at 163. The trial court had found that, although the Governor had acted "entirely in good faith," *id.* at 164, he should have used certain discretionary funds at his disposal to supplement the legislature's inadequate appropriation. The trial court, therefore, ordered that the Governor and Comptroller be held in contempt if adequate funding was not provided. The Court of Appeals reversed, finding that the Governor could obey the trial court's order only by violating the constitution and laws of New York.

The Court of Appeals in *Carey* held that it was beyond the district court's power to interfere with the appropriations processes of an unwilling legislature. Noting that

---

31. Defendants have not in the past, and do not now question the validity of the decrees themselves. Thus, the only issue presented here is the merit of defendants' proposed staff reductions. *Cabrera v. Municipality of Bayamon*, 622 F.2d 4, 7 (1st Cir. 1980).

the district court's order required "a state official [to] expend state funds for a purpose expressly disallowed by the state legislature," *id.* at 165, the court stated,

> [i]n the face of constitutional violations at a state institution, a federal court can order the state either to take the steps necessary to rectify the violations or to close the institution. *Thus a state cannot avoid the obligation of correcting the constitutional violations of its institutions simply by pleading fiscal inability* .... But that remedy leaves the question of expenditure of state funds in the hands of citizens of the state, not in the hands of federal judges.

*Id.* at 165 (cites omitted) (emphasis supplied).

The considerations raised in *Carey* are clearly distinguishable from those involved here. The holding in *Carey* was premised on the district court's finding that

> Governor Carey ha[d] complied with the Consent Judgment by taking all steps within his lawful authority to secure funding for the panel.

*Id.* at 163. Further, the Court of Appeals was influenced by the fact that the district court's order gave the Governor the Hobson's Choice of violating either the state constitution or a federal court order. Significant also is the fact that the dispute in *Carey* involved the legislature's refusal to fund a court monitor's office, the deprivation of which the court determined to be of less than constitutional dimension.

> [T]here is no basis for additionally assuming that, by itself, the state's refusal to fund the Review Panel, which was

established by the Consent Judgment, violates the Constitution.

*Id.* at 165.

Here, however, we are dealing with the issue of maintaining direct patient care at a level consistent with constitutional and statutory mandates. The fundamental question presented is whether these consent decrees—the agreed upon means for eliminating chronic constitutional deprivation at our institutions for the retarded—are being complied with. To resolve that issue this court must determine which, if any, of defendants' 408 proposed staff cuts can be made without endangering the constitutional protection intended and afforded by the consent decrees.

Hence in the instant case, unlike *Carey*, the court is neither examining the legislature's budgetary decisions nor the good faith efforts, to date, of the defendants. The court is merely asked to determine what actions are required of state executive officials to insure the Commonwealth's continued compliance with these decrees. *Cf. Coalition for Basic Human Needs v. King*, 654 F.2d 838, 842 (1st Cir. 1981) (distinguishing legislative from executive action).[32]

The issue here also is materially different from that in *Brewster v. Dukakis*, 675 F.2d 1 (1st Cir. 1982). As shall be demonstrated in Section IVB, *infra*, a failure by the legislature to appropriate sufficient funds here eventually would result in a return to the medieval custodial practices of a decade ago.[33] Unlike *Brewster*, which concerned new community programs, inadequate funding here would lead to a dismantling of *ongoing* programs which in the past few

---

32. In determining the merit of defendants' proposed budget cuts, however, it has been necessary for this court to evaluate defendants' efforts to ascertain the level of staffing necessary to meet the Decree's requirements. Thus it is relevant that, in contravention of the clear mandate of the Decree, the Governor acted unilaterally to cut staffing by 408 and, to that end, cut his budget request of the legislature by 5.1 million dollars. The purported rationale behind those cuts is discussed in Section IV, *infra.*

33. Dr. Osborn who is an Associate Regional Administrator with the U. S. Department of Health and Human Services, and on whom this court relied for guidance in determining what staffing levels are necessary under the Decree, *see* Section IVB, *infra*, stated that

> [i]nstitutions of this size ... take years of hard work by all sorts of agencies and people and whatever to make the improvements. They can regress to their former status at the speed of light.

Testimony of Lawrence Osborn, tr. 10 54 (1/12/82).

years have benefited thousands of class members who may now have a legitimate basis for expecting their continuation. A failure to fund could, therefore, raise the question as to whether these class members have now acquired a right to continued funding based on the legislative and executive branches' clear and ongoing commitment to the decrees. In other contexts, the Massachusetts courts have themselves recognized that an obligation lawfully incurred by the executive or judicial branch can be enforced, even absent a specific legislative appropriation. *O'Coins Inc. v. Treasurer of County of Worcester*, 362 Mass. 507, 287 N.E.2d 608 (1972); *U. S. Trust Co. v. Commonwealth*, 348 Mass. 378, 204 N.E.2d 300 (1965).

Because the Decree expressly bars unilateral reductions in personnel, this court has the obligation to determine the level of staffing necessary to assure compliance with the Decree, and to require defendants to maintain previous staffing levels pending such a determination. *Brewster* does not suggest that the Commonwealth could not *agree* to maintain existing staffing levels while the issue of staffing needs was being resolved. To the contrary, the Decree manifests the parties' intention to maintain the *status quo* pending the court's resolution of disputes concerning staffing levels. And unlike *Brewster*, where the defendants acknowledged noncompliance but argued impossibility of performance, defendants here maintain that the reduction of 408 was clinically appropriate and in keeping with the mandate of the consent decrees.

Further, the defendants here have not suggested that the executive branch was not authorized to enter into the decrees, nor to assume the legal obligations contained therein. They have not argued, as indeed they could not, that the legislature did not intend the state to become bound by the decrees. The legislative leadership has expressed unqualified support for full implementation of the decrees in hearings before this court. The legislature as a whole has funded them. The defendants have never challenged this court's jurisdiction to enforce the consent decrees.

Moreover, the Eleventh Amendment is not implicated here because any relief ordered would be prospective in nature, *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hutto v. Finney*, 437 U.S. 678, 690, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978), and would give the defendants the choice of complying with the court's order or closing the schools. *See Ad Hoc Committee on Judicial Administration v. Massachusetts*, 488 F.2d 1241, 1245–46 (1st Cir. 1973) *cert. denied* 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974); *Welsch v. Likins*, 550 F.2d 1122, 1132 (8th Cir. 1977).

This case is similar to *Milliken v. Bradley*, 433 U.S. 267, 289–90, 97 S.Ct. 2749, 2761–62, 53 L.Ed.2d 745 (1977), where the Court held that a state may be required to pay a portion of a remedial education program designed to eliminate the effects of *de jure* segregation. The Court found that the Eleventh Amendment did not bar such relief, under the principles set forth in *Edelman*.

The decree to share the future costs of educational components in this case fits squarely within the prospective compliance exception reaffirmed by *Edelman*. That exception, which had its genesis in *Ex parte Young*, 209 U.S. 123 [28 S.Ct. 441, 52 L.Ed. 714] (1908), permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury. 415 U.S., at 667 [94 S.Ct., at 1357]. The order challenged here does no more than that. The decree requires state officials, held responsible for unconstitutional conduct, in findings which are not challenged, to eliminate a *de jure* segregated school system....

These programs were not, and as a practical matter could not be, intended to wipe the slate clean by one bold stroke, as could a retroactive award of money in *Edelman*. Rather, by the nature of the antecedent violation, ... the victims of Detroit's *de jure* segregated system will continue to experience the effects of seg-

regation until such future time as the remedial programs can help dissipate the continuing effects of past misconduct. Reading and speech deficiencies cannot be eliminated by judicial fiat; they will require time, patience, and the skills of specially trained teachers. That the programs are also "compensatory" in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system. We therefore hold that such prospective relief is not barred by the Eleventh Amendment.

*Id.* (footnotes omitted). Here, compliance with the consent decrees is necessary to insure that the retarded will have the continuing benefit of direct care programs which the parties themselves agreed were necessary to meet constitutional and Title XIX standards. Given an intransigent legislature, essential remedial effort called for by the consent decrees may permissibly have " . . . a direct and substantial impact on the state treasury." *Id.* at 289, 97 S.Ct. at 2762. On that score, it is reasonable to have in mind the Governor's well publicized pronouncements that, under his stewardship, the Commonwealth's treasury now enjoys a 100 million dollar surplus.

## IV

### The Defendants' Effort at Compliance With the Personnel Decree

The defendants contend that their across-the-board reduction of 408 staff positions is consistent with a perceived "ratio of staff to client census set forth in the personnel consent decree." [34] They also argue that a staff reduction of 408 will not compromise

their obligations under the Personnel Decree. They maintain that the figure 408 was chosen only after thorough consideration of the needs of the clients and the views of qualified individuals responsible for the administration of the institutions. Finally, the defendants say that they made the necessary effort to "secure sufficient appropriations from the General Court to maintain compliance with the requirements of the consent decrees." [35]

Governor King's 1982 budget request of the General Court called for a 5.1 million dollar cut in spending for personnel at the five state schools for the retarded which are subject to the Personnel Decree. [36] This reduction in requested funding corresponded to the Governor's proposed 408 staff position cut. Contrary to the provisions of the decree, the Governor's staff and budget cuts were undertaken without plaintiffs' agreement or the permission of this court. According to the affidavits of Governor King, former Secretary Mahoney (of the Executive Office of Human Services) and former Secretary Hanley (of the Executive Office for Administration and Finance), [37] Secretary Mahoney was initially informed by the Commissioner of Mental Health and his staff that the staffing levels at the five state schools could be reduced in a way that was "clinically appropriate and that . . . conformed to all legal requirements of the Personnel Decree and other consent decrees . . . ." [38] Governor King's understanding, according to his affidavit, was that permissible staff reductions could be accomplished because of projected decreases in the institutions' resident population due to attrition and community placements. [39]

---

**34.** Defendants' Pretrial Memorandum ¶ 1 (8/31/81). While the meaning of this phrase might otherwise have remained unclear, since there is no ratio "set forth" in the Personnel Decree, testimony offered at the hearing indicates that defendants derived the "ratio" by the comparing staffing and census levels anticipated by the consent decrees.

**35.** Defendants' Pretrial Memorandum 1 (8/31/81).

**36.** Affidavit of Edward J. King, Plaintiffs' Exh. 56 ¶ 2.

**37.** *See* plaintiffs' Exh. 56, Exh. 57, and Exh. 58.

**38.** Plaintiffs' Exh. 57, Affidavit of Charles F. Mahoney, (7/31/81).

**39.** Even accepting the Governor's expression of understanding at face value, it is clear that the decrease he anticipated will not come about in the foreseeable future. The legislature did not provide any funds in the Fiscal Year 1982 budget for community placements from the five state schools for the retarded. As a result, 485 clients who were expected to be transferred out

Contrary to defendants' assertions, plaintiffs maintain that the proposed 408 person staff cut was a response to budgetary pressure and was not based on an analysis of client needs. Plaintiffs assert that the original impetus for the challenged reduction came, not from professionals within the Department of Mental Health, but from Secretary Mahoney, whose purported instruction to then Assistant Commissioner for Mental Retardation Linda Glenn was to cut the Department of Mental Health budget by a certain dollar figure. Plaintiffs contend that, once given Secretary Mahoney's mandate, Commissioner Glenn set out to identify positions sufficient in number to meet the predetermined budget cut, without regard to the individual needs of the resident population.

The First Circuit has recently clarified the standards to be utilized in examining whether state defendants have complied with the requirements of consent decrees involving public law litigation. In *Massachusetts Association for Retarded Citizens, Inc. v. King*, 668 F.2d 602, 607–608 (1st Cir. 1981), the court stated,

[a]t the outset, we note that consent decrees, at least when entered into by private parties, are often viewed as contracts, interpretation of which depends in part upon language, in part upon the circumstances surrounding their formation, and in part upon the basic purposes of the decree. *United States v. ITT Continental Baking Co.*, 420 U.S. 223 [95 S.Ct. 926, 43 L.Ed.2d 148] (1975). We recognize that programmatic decrees in public law litigation may call for somewhat more flexible interpretation in light of the need to achieve their basic purposes (the eradication of unconstitutional conditions) and the need to accommodate the differing competencies of different branches of government as well as the differing needs and interests of the parties.... These considerations, along with the traditional tools of language, circumstance, and purpose, are determinative of the case before us.

Thus where traditional contract principles would lead to an interpretation which is overly rigid, or which ignores the distinct functions and capabilities of the different branches of government, the court must be willing to look outside of the decree for guidance in construing it.

No such exigent circumstances exist here, however. The Personnel Decree, and the underlying consent decrees, are clear and unambiguous. They require the defendants to comply with Title XIX and its regulations, and to provide class members with active treatment administered by qualified personnel pursuant to detailed individual service plans. They require the state to do no more than that which it must do under federal statutes in order to qualify for federal funding of a program in which it is participating voluntarily.

The basic purpose of these decrees is to eradicate unconstitutional conditions by assuring compliance with federal statutory standards.[40] The defendants are charged with executive responsibility for operating the Commonwealth's schools for the retarded. Consistent with that responsibility, the Governor and his staff have an obligation to prepare and submit a budget request to the General Court that reflects the level of appropriation necessary to comply with the Title XIX standards which permeate these decrees.

The magnitude of the effort that all parties devoted to the drafting of these decrees underscores the seriousness with which they approached the question of personnel. The amount of thought, study, and negotiation devoted to developing the original staffing levels indicates the complex confluence of factors which must be considered in determining staffing needs. The requirement of Paragraph 10 of the Personnel Decree that

---

of their respective schools will remain institutionalized. There may, in addition, be an increase over previous years in the number of individuals transferred back to the schools.

Testimony of Kathy Schwaninger, tr. 3–120 to 121, 3–139, and 3–142 (11/20/81).

**40.** Plaintiffs' Exh. 1, PERSONNEL DECREE, ¶ 2.

the parties submit disagreements concerning the level of staffing to this court for resolution demonstrates an intention that personnel reductions be implemented only after a careful analysis of the clinical, educational, and other needs of the individual clients. Neither the parties nor the court contemplated that the court's supervisory role would be merely to resolve disputes by determining the correct computation of some mathematical ratio.

Moreover, the Decree reflects sensitivity to the budgetary and administrative limitations on the Commonwealth's ability to provide optimum staffing levels. It requires only that the defendants comply with the Title XIX standards to which the Commonwealth is already committed, and that active treatment thereby be provided to all class members pursuant to individual service plans.

A) *The Proposed Reduction*

Defendants maintain that their proposed reduction of 408 staff positions is clinically appropriate and would not detract from their ability to comply with the Personnel Decree and the five consent decrees. Although defendants admit that they used a mathematical analysis to establish the upper limit of the proposed reduction, they argue that they adopted the final figure of 5.1 million dollars only after consideration of client needs and changing institutional conditions. They seem to suggest, as well, that the Governor's submission of a reduced budget was intended to forestall a larger and more devastating cut in the Mental Health Department's budget by the legislature.

The evidence persuades this court that the Governor's decision to reduce the budget by 5.1 million dollars was primarily a budgetary one. Any analyses that were conducted did not take sufficient account of client needs or the decree requirements. The device of seeking a 5.1 million dollars reduction in order to avoid a greater one by the legislature was ill-advised at best, and contravened the mandates of the decrees, at the very least.[41]

The relevant budgetary process began in September 1980,[42] when the superintendents of the five state schools submitted to the Department of Mental Health, and particularly Commissioner Glenn,[43] their proposed fiscal year 1982 budgets.[44] Their proposals did not call for reductions in staffing levels,[45] even though they were aware that the population of the institutions had diminished since the consent decrees were signed,[46] and that a large number of community placements were anticipated for fiscal year 1982. Based in part on the Superintendents' requests, the Department of Mental Health recommended to the Executive Office of Human Services that the consent decrees again be "fully funded," and that the operating budget of the state schools be increased.[47] Thus the Department's original budget request, submitted in October 1980, called for an increase in expenditures for the five state schools for the retarded.

41. The mere filing of a Special Message to the legislature might well be judged as having been less than a "reasonably diligent and energetic [attempt] to accomplish" compliance. *Palmigiano v. Garrahy, supra*, at 670. A Special Message unadorned by a significant, legitimate lobbying effect has the tactical punch of a paper airplane.

42. Testimony of Linda Glenn, tr. 6–9 (12/1/81).

43. Then Assistant Commissioner for Mental Retardation, Ms. Glenn is now an Associate Commissioner of the Department of Mental Health. Testimony of Linda Glenn, tr. 6–6 (12/1/81).

44. Ms. Glenn testified that she began working on the proposed fiscal year 1982 budget during the summer of 1980. There is no evidence that the work she did prior to September 1980 was related to personnel at the five state schools, however.

45. Testimony of Francis Kelley, tr. 1–88 (9/3/81); Ronald Rosen, tr. 1–103 (9/3/81); Ellsworth Pearl, tr. 2–62 to 2–63 (9/4/81).

46. *See*, for example, the testimony of Francis Kelley, tr. 1–88 (9/3/81).

47. Testimony of Linda Glenn, tr. 6–13 (12/1/81).

In early October 1980, after the Department submitted its initial budget request totaling approximately 558 million dollars,[48] Secretary Mahoney and his staff directed the Department to reduce its request by approximately 50 million dollars. According to Commissioner Glenn, Mr. Mahoney's office did not instruct the Department to cut the personnel budget specifically.[49] The impetus for the personnel cut came from Glenn herself who, in a memo of November 24, 1980 to the Assistant Secretary of the Executive Office of Human Services (EOHS)[50] proposed a 5.1 million dollar reduction in funding for personnel at the state schools for the retarded. Her proposal postdated several meetings with Secretary Mahoney, his staff, and her superiors at the Department of Mental Health,[51] as well as internal analyses conducted by Ms. Glenn's staff.

The 5.1 million dollar reduction was approved by the EOHS and was included in the Governor's budget request of January 1981. But, the superintendents were not informed that their personnel budgets were to be significantly reduced until March 1981.[52] It was not until May 18, 1981 that they were told the amount of the reduction, and what portion of it each institution was expected to absorb.[53]

Ms. Glenn testified that she had discussed the possibility of personnel reductions with two of the superintendents[54] and with other officials in the Department of Mental Health, including then Commissioner Okin,[55] before the directive from Secretary Mahoney's office was issued. But she also stated that, had she not received Mahoney's directive she would not have submitted a reduced budget.[56] She did not, before receiving the directive, tell the superintendents that their proposed budgets were too high.[57] Moreover she did not, prior to this hearing, inform this court that the level of personnel at the state schools could be significantly reduced without undermining defendants' compliance with the consent decrees.[58] These facts, when viewed in light of the statements of the superintendents indicating that an immediate reduction in staffing could or would threaten their ability to comply,[59] cast considerable doubt on the defendants' assertion that the proposed reduction is based on clinical considerations.

Defendants admit, moreover, that the reduction was not based on a position-by-position examination of staffing needs, nor even on an institution-by-institution analysis.[60] In fact, the superintendents were initially instructed by the Department of Mental Health to reduce their budgets by certain dollar amounts, rather than to eliminate particular staff positions.[61] It was not until long after the 5.1 million dollar reduction was formally submitted by the Governor that the superintendents were asked to identify the positions to be eliminated.[62]

48. Testimony of Linda Glenn, tr. 8–52 (12/4/81).

49. Testimony of Linda Glenn, tr. 6–14 (12/1/81).

50. Plaintiffs' Exh. 42.

51. Testimony of Linda Glenn, tr. 6–18 and 6–19 (12/1/81).

52. Testimony of Ellsworth Pearl, tr. 2–10 (9/4/81).

53. Testimony of Ronald Rosen, tr. 1–104 (9/3/81); Francis Kelley 1–176 (9/3/81).

54. Testimony of Linda Glenn, tr. 6–49 to 6–59 (12/1/81).

55. Id., tr. 6-39.

56. Id., tr. 6-36.

57. Id., tr. 6–42.

58. Id., tr. 6–62.

59. Testimony of Francis Kelley, tr. 1–72 to 1–87; testimony of Ronald Rosen 1–111; Affidavit of W. Jones, Plaintiffs' Exh. 50, ¶ 4.

60. Testimony of Linda Glenn, tr. 6–142 (12/1/81).

61. Testimony of Francis Kelley, tr. 1–77 (9/3/81); Ellsworth Pearl, tr. 2–9 to 2–10 (9/4/81).

62. Testimony of Francis Kelley, tr. 1–76 (9/3/81); Ronald Rosen, tr. 1–104 (9/3/81); Ellsworth Pearl tr. 2–10 to 2–11 (9/4/81). Testimony of David DeKing, tr. 9–24 (12/11/81).

Defendants' assertion that a reduction of 5.1 million dollars in the personnel account for the state schools for the retarded is clinically appropriate [63] prompts this court to examine closely the process defendants utilized in arriving at this figure. Upon being instructed by Secretary Mahoney to reduce her budget request, Ms. Glenn initially looked to the mental health side, rather than the mental retardation side, of the Department's budget. When reductions in the mental health portion proved insufficient to meet the 50 million dollar figure imposed by Secretary Mahoney's office, she felt compelled to seek reductions in the mental retardation budget.

Ms. Glenn instructed David DeKing, then Director of Facility Support within the Division of Retardation, to prepare a report for her indicating the potential dollar savings in personnel if staffing levels at the state schools were reduced to match the "implied" staff-client ratios reflected in the consent decrees.[64] A reduction was anticipated because of actual and expected census decreases resulting from community placements and attrition, although the possible transfer of clients from state mental institutions to the state schools for the retarded was also being considered.

Mr. DeKing spent only four to five hours on the project. His effort consisted of updating census and staffing information the Department already possessed, and compiling the numbers to reflect possible dollar savings.[65] He arrived at two figures—a possible 10.5 million dollar reduction based on census figures up to fiscal year 1982, and a seventeen million dollar reduction based on census figures through fiscal year 1982.

Ms. Glenn then asked her staff, and particularly Mr. DeKing,[66] "to take a hard look at what within the 10.5 would be reasonable . . ."[67] as a budgetary decrease, based on their knowledge of the state schools. Ms. Glenn testified that she discussed the staffing needs and the ramifications of the reductions with Mr. DeKing's supervisor, Mary Cliett, while DeKing was conducting the second phase of his analysis. But she conceded that her 5.1 million dollar budget cut recommendation to Secretary Mahoney was based on Mr. DeKing's five hour analysis and recommendation to her.[68]

Although Ms. Glenn accepted Mr. DeKing's recommendation as clinically sound, she admitted that she did not know whether he had spoken with any of the superintendents before arriving at his figure,[69] whether he consulted Hans Toegel, the head of the Department of Public Health Title XIX compliance team,[70] or whether, in fact, he had reviewed any individual service plans.[71] In fact, she did not ask him with whom he had spoken.[72] She "assumed" that he utilized data the Department of Mental Health had recently developed through "a very thorough analysis of the Active treatment provided each client in each of the state schools for the mentally retarded."[73]

This court's comments are not intended as an indictment of Mr. DeKing. He is neither a clinician nor a management expert.[74] He was given only one week to complete his analysis.[75] Given these circumstances, he was in no position to con-

**63.** Testimony of Kathy Schwaninger, tr. 4–56, 4 -124 (11/24/81).

**64.** Testimony of David DeKing, tr. 8–86 to 8–87 (12/4/81).

**65.** Testimony of David DeKing, tr. 8–93 to 8–94 (12/4/81).

**66.** Testimony of Linda Glenn, tr. 6–126 to 6–127 (12/1/81).

**67.** *Id.*, tr. 6–127.

**68.** *Id.*, tr. 6–129.

**69.** *Id.*, tr. 6-131.

**70.** *Id.*

**71.** *Id.*, tr. 6–133.

**72.** *Id.*, tr. 6–131 to 132.

**73.** *Id.*, tr. 6–131 to 132.

**74.** Testimony of David DeKing, tr. 8–71 to 8-72 (12/4/81).

**75.** Testimony of Linda Glenn, tr. 6–136 (12/1/81).

duct a detailed clinical study based on clients' individual service plans or the institutions' actual personnel needs. Rather, he was asked to take "a global look at the available staff and what [the Department] had already added" as a result of the consent decrees.[76]

Mr. DeKing's second analysis, from which he derived the 5.1 million dollar figure, consisted of two components. He engaged in continuing discussions with clinicians in the central office of the Department of Mental Health,[77] and he conducted further mathematical calculations based on the "implied ratios" in the consent decrees, and projected census figures. His testimony makes it clear, however, that he arrived at the 5.1 million figure primarily through numerical manipulation. According to his testimony, Ms. Glenn was concerned not so much with ascertaining the clinically appropriate level of personnel, but with providing a "buffer"[78] for the 10.5 million dollar figure derived earlier through application of the "implied ratio." Mr. DeKing's second analysis was not based on discussions with the superintendents, the Department of Public Health Title XIX survey office, nor with the United States Department of Health and Human Services, the federal agency charged with enforcing the requirements of Title XIX.[79] Instead he derived the 5.1 million dollar figure by recalculating the potential savings from community placements using only one quarter of the projected FY81 placements.[80] This would, in his words, provide "the buffer that [the

Department was] looking for to allow for if something happened with Title XIX."[81]

Ms. Glenn gave Mr. DeKing just one week to complete his analysis because, though it was admittedly an important assignment, "[i]t was also important to get a budget submitted to [Secretary] Mahoney that he could accept and support."[82] The Department of Mental Health simply was not given enough time to conduct the type of analysis required to assure the clinical appropriateness of a 5.1 million dollar staff reduction.[83] The analytical steps necessary to assure adequate service delivery were outlined by Ms. Schwaninger in her testimony before this court,[84] yet there is no evidence that the procedures she described were[85] or are[86] being followed. Instead, the Department simply "updated"[87] the pre-Personnel Decree studies by comparing the numbers of staff and clients anticipated in the consent decrees with current staff-client ratios and projected census levels. The inadequacy of this approach becomes even more evident when one considers Ms. Glenn's concern over the credibility of the Title XIX analysis recently conducted by the United States Department of Health and Human Services, which was far more involved and detailed than Mr. DeKing's analysis.[88]

The assessment conducted by Linda Glenn and her staff did not address itself to the question of whether a reduction could be accomplished without undermining consent decree and Title XIX compliance. Rather, her prime concern was to find a way to meet Secretary Mahoney's mandate

76. *Id.*, tr. 6–141.

77. Testimony of David DeKing, tr. 9–26 (12/11/81).

78. Testimony of David DeKing, tr. 8–92 (12/4/81).

79. Testimony of David DeKing, tr. 9–24 (12/11/81).

80. Testimony of David DeKing, tr. 8-92 (12/4/81). *See also* Plaintiffs' Exh. 42, p. 2.

81. Testimony of David DeKing, tr. 8–92 (12/4/81).

82. Testimony of Linda Glenn, tr. 6–142 (12/1/81).

83. *Id.*

84. Testimony of Kathy Schwaninger, tr. 5–19 to 5–23 (11/25/81).

85. *Id.*, tr. 5–24 to 5–25.

86. Testimony of Linda Glenn, tr. 8–7 (12/4/81).

87. *Id.*, tr. 8 -25.

88. *Id.*, tr. 8 -60.

that the budget be cut.[89] Moreover, the Department knew or reasonably should have known that its recommendation would not obviate greater reductions by the legislature. In fact it had every reason to believe that the legislature would further reduce its budget.[90]

The Department's recommendation that 5.1 million dollars be cut from the personnel budget is admittedly based on ratios impermissably derived from the consent decrees.[91] Defendants' assumption that staffing reductions may be determined by merely applying ratios is just plain wrong.[92] A variety of factors must be considered in order to make a clinically meaningful determination of client need and consent decree compliance. These include the number of community placements,[93] changes in the physical layout of new and renovated buildings,[94] and the changing configuration of client characteristics.[95] None of these factors was adequately considered by defendants, either before or since the recommendation to cut 5.1 million dollars was made.

B) *The Osborn Report*

The testimony of various Department of Mental Health employees thus made it clear

that the decision to reduce personnel at the five state schools for the retarded by 408 was primarily a budgetary decision, rather than a clinical one. But the question remained in this court's mind as to whether *some* reduction in personnel could be accomplished without violating the consent decrees and Title XIX requirements.

In an effort to resolve that issue, this court requested the assistance of Dr. Lawrence A. Osborn. Dr. Osborn [96] is the Associate Regional Administrator for Health Standards and Quality (HSQ) in the Region I Office of the United States Department of Health and Human Services.[97] He is charged with determining whether the Commonwealth is meeting Title XIX requirements. He has at his disposal the analytic and investigative resources, including his own and his colleagues' professional expertise and the survey capabilities and Title XIX experience, of his regional office. At the court's request, Dr. Osborn supervised a limited study of the five state schools in late 1981 and early 1982, which was supplemented by an analysis conducted in late January and early February 1982.[98] Dr. Osborn's conclusion, based on these studies, is that only 84.5 of the 408 positions can be

---

**89.** *See* testimony of Linda Glenn, tr. 6–113 (12/1/81).

**90.** Testimony of Linda Glenn, tr. 7–154 (12/2/81).

**91.** Testimony of David DeKing, tr. 9–21 to 9–11 (12/11/81).

**92.** Testimony of Linda Glenn, tr. 7–22 (12/2/81).

**93.** Testimony of Linda Glenn, tr. 8–43 (12/4/81).

**94.** Testimony of Linda Glenn, tr. 8–43, 8–44 to 8–45 (12/4/81); testimony of Kathy Schwaninger, tr. 4–106 (11/24/81).

**95.** Testimony of Kathy Schwaninger, tr. 4–106 (11/24/81).

**96.** Dr. Osborn is trained as a psychiatrist. He obtained his medical degree from Cornell University and completed his psychiatric residency at Massachusetts General Hospital. He also holds a Master's degree in Public Health from Harvard University. He is currently a commis-

sioned officer in the United States Public Health Service. Testimony of Lawrence Osborn, tr. 3–79 (11/20/81).

**97.** The Division of Health Standards and Quality is one of four divisions within the Health Care Financing Administration's regional office in Boston. The Health Care Financing Administration office is, in turn, one part of the Region I office of the United States Department of Health and Human Services. Dr. Osborn and his division are responsible for survey and certification activities relating to Title XIX compliance in the six New England states. *Id.*, tr. 3–78 (11/20/78).

**98.** Testimony of Lawrence Osborn, tr. 10–156 to 157 (1/12/82). The parties were also given the opportunity to challenge Dr. Osborn's initial recommendations. *See* attachments E and F to Exhibit 48. In the supplemental study Dr. Osborn had an opportunity to refine his initial recommendations for reducing non-direct care personnel because of doubts he expressed about the validity of the original recommendation.

eliminated without endangering consent decree compliance.[99]

Dr. Osborn's initial study included onsite visits at each of the five state schools by joint federal-state survey teams headed by Qualified Mental Retardation Professionals.[100] They analyzed data from recent DPH surveys of the schools, DMH "Clinical Impact Analyses," affidavits submitted by the superintendents to this court, and materials provided by the court monitor's office.[101] Although Dr. Osborn's office has responsibility only for the Medicaid population of the state schools, the initial study, which used a total sample of 105 clients,[102] included a review of non-Medicaid records in approximately the same proportion as exists at the schools generally.[103] And while, according to Dr. Osborn, both studies suffered from a bias in favor of showing more active treatment rendered and fewer Title XIX deficiencies than is actually the case,[104] this bias was taken into account when the final recommendations were prepared.[105]

Although Dr. Osborn tended to resolve doubts about the necessity of retaining particular positions in favor of retention, this was not always the case.[106] His supplemental report properly reflected a willingness to eliminate a particular position when there were no significant Title XIX deficiencies related to the position, when there was a clear administrative justification presented for the reduction, and when there

was no credible contradictory evidence offered by the plaintiffs in support of retention.[107]

Dr. Osborn's reports indicate that, while there have been dramatic improvements in the physical conditions and treatment rendered at the five state schools for the retarded since the consent decrees were initially implemented,[108] deficiencies in service delivery and Title XIX compliance remain.[109] More relevant to the issue presently before this court, the Osborn reports make it clear that eliminating the 408 positions originally targeted by defendants would seriously jeopardize defendants' ability to comply with the consent decrees and Title XIX.[110] Indeed, Dr. Osborn stated that a reduction of the magnitude defendants propose would almost certainly lead to a regression in the quality of care and physical well-being of residents to a level comparable to that existing before these suits were instituted.[111]

It is significant to note as well that his report suggests that a reduction of five million dollars in the budget of the five state schools could have been accomplished without undermining consent decree and Title XIX compliance had the school superintendents initially been given greater flexibility to allocate the reduction among different operating accounts.[112] That finding underscores the weakness of defendants' ratio-based approach to cost containment.

99. *Id.*, tr. 11-6 (2/17/82).

100. 42 C.F.R. Sec. 442.401.

101. Plaintiffs' Exh. 47, pp. 22-24.

102. Testimony of Lawrence Osborn, tr. 11–14 (2/17/82).

103. *Id.*, tr. 11 13 (2/17/82).

104. *Id., tr.* 10 13 to 14 (1/12/82); Tr. 11–9 to 10 (2/17/82).

105. *Id.*, tr. 11 10 (2/17/82).

106. *Id.*, tr. 11 37 to 39 (2/17/82).

107. Plaintiffs' Exh. 48, p. 2.

108. Plaintiffs' Exh. 47, p. 5.

109. Plaintiffs' Exh. 47, p. 24; Testimony of Lawrence Osborn, tr. 10–53 (1/12/82).

110. *See*, e.g., Plaintiffs' Exh. 48 (Supplemental Federal Report) p. 7.

111. Testimony of Lawrence Osborn, tr. 10–54 (1/12/82). Dr. Osborn stated that, for example, "if Wrentham and Belchertown were asked at this moment to absorb all the positions they were asked to absorb out of the 5016 account, I think the percentage of [those not receiving] active treatment would rather rapidly go up to 30, 40 percent. And there would be additional deficiencies that might endanger Title XIX certification." *Id.* at 10–55.

112. Testimony of Lawrence Osborn, tr. 10-46 (1/12/82). *See also* Plaintiffs' Exh. 47, p. 8.

Although the Osborn study was conducted in a relatively short period of time and suffers from some empirical weaknesses, which were fully illuminated in the reports themselves [113] and in Dr. Osborn's testimony,[114] the court finds it to be an objective, credible, and valid analysis. Dr. Osborn and his assistants did not assume, before conducting the study, that *any* reduction would necessarily violate Title XIX, nor did they view it as their duty to provide a justification for the reductions proposed by the Commonwealth.[115] Moreover, they relied on a vast amount of information supplied by defendants, plaintiffs, and the Court Monitor's office, and utilized sound analytical guidelines [116] in arriving at their recommendation. Thus the court accepts Dr. Osborn's conclusion that only 84.5 of the 408 targeted positions may be reduced without serious jeopardy to the standard of direct care and treatment now being provided at the state schools.

### Conclusion

The decrees that have guided the remedial phase of these cases are not the whim of the federal court, nor do they represent an activist intrusion on the prerogatives of state government. Rather, they represent an acknowledgment by the Commonwealth that, for too many years, our retarded citizens were "benignly" permitted to exist in filth and squalor, despite the best efforts of staff too few in number to have any chance of meeting their professional responsibilities.

After viewing these state institutions, this court publicly termed them to be little more than "pig pens" and "human warehouses." [117] That assessment was never challenged by any state official. Indeed, the Attorney General himself termed conditions at these institutions to have been "indefensible." [118] His enlightened attitude led to the fashioning of these decrees, which have taken the retarded from a snake pit environment to one enabling them to survive their misfortune under conditions that at least minimally demonstrate the Commonwealth's regard for their human dignity.

The terms of those decrees were not imposed by the federal court. Capital renovations were bargained for and agreed to by the parties, building by building, room by room. Staffing requirements were bargained for and agreed to by the parties on, literally, a position-by-position basis.

The common and consistent criterion throughout the bargaining process was NEED. The parties strove to determine what capital and staffing improvements were *necessary* to permit the retarded to live with the degree of human dignity required under our Constitution. These decrees represent the parties' response to that question—a response that transcended either liberal or conservative political points of view.

The Commonwealth has always had limited resources. Mindful of that fact, the parties crafted the terms of these decrees with an eye toward insuring that the people of this state would receive a full measure of value for every tax dollar devoted to the success of this ambitious but constitutionally necessary remedial undertaking.

Today's fiscal problems do not alter the fact that these decrees are essential to insure that there will be no return to the "indefensible" conditions of the past. The retarded have no potent political constituency. They must rely on the good will of those of us more fortunate than they, and the Constitution which controls the manner in which all of us must meet our varied responsibilities.

---

113. Plaintiffs' Exh. 47, p. 25.

114. Testimony of Lawrence Osborn, tr. 10–14 (1/12/82).

115. *Id.*, tr. 10–154 to 155 (1/12/82).

116. Plaintiffs' Exh. 48, pp. 1–1; Plaintiffs' Exh. 47, pp. 12–21.

117. Transcript of the July 25, 1977 Hearing at p. 8.

118. *Id.* at pp. 17–18.

This court concludes that in unilaterally seeking a 408 person staff cut, and an ancillary 5.1 million dollar budget cut, defendants have failed to meet their responsibilities to the retarded under the terms of these decrees. Mindful that there must be ever-vigilant monitoring to achieve cost containment and savings whenever possible, this court determines that certain staffing reductions may be made by the defendants without violating the applicable consent decrees or the requirements of Title XIX. Those reductions are set forth in the attached appendix.

An order will issue. ,

## ORDER

1) Defendants' request for permission to reduce by 408 the number of staff positions at state institutions for the retarded would, if granted, render them unable to comply with the applicable consent decrees. That request is, therefore, denied.

2) The defendants may eliminate those positions designated in the Appendix to the opinion filed herewith, without breaching their obligations under the applicable consent decrees or the orders of this court.

3) The defendants are to take all steps within their lawful authority to insure compliance with this order, and to secure the funding necessary for compliance with the consent decrees. *Palmigiano v. Garrahy,* 448 F.Supp. 659, 670 (D.R.I.1978); *New York State Assoc. for Retarded Citizens v. Carey,* 631 F.2d 162, 163 (2d Cir. 1980).

4) In view of this order, defendants' motion to proceed with extraordinary measures, filed April 8, 1982, is denied as moot.

It is so ORDERED.

## APPENDIX

### WALTER FERNALD SCHOOL

| Position Considered for Reduction | Number of Permitted Reductions |
|---|---|
| Construction Handyman | 0 |
| Head Dining Room Attendant | 0 |
| Head Institutional Protection Man | 0 |
| IDA | 0 |
| IDW | 3 |
| Institutional Protection Man | 0 |
| Junior Library Assistant | 1 |
| Mechanical Handyman | 0 |
| MR LPN | 0 |
| MR OT Assistant | 0 |
| Nurse Practitioner | 0 |
| Plumber and Steamfitter | 1 |
| Recreation Therapist | 0 |
| Senior Clerk & Stenographer | 2 |
| Senior Clerk & Typist | 0 |
| Senior LPN | 0 |
| Special Services Assistant | 1 |
| Staff Clinical Social Worker | 0 |
| Supervisory Institutional Housekeeper | 0 |
| Unit Clothing Manager | 0 |
| Vocational Instructor | 0 |
| Rehab. Counselor, Commission for the Blind | 1 |
| Total | 9 |

### BELCHERTOWN STATE SCHOOL

| Position Considered for Reduction | Number of Permitted Reductions |
|---|---|
| Chief Psychologist | 0 |
| Cooks | 10 |
| Chef | 0 |
| Compliance Officer | 0 |
| Director of Institutional Housekeeping | 0 |
| Electrician | 0 |
| Functional Unit Director | 1 |
| Head Nurse | 0 |
| Head OT | 0 |
| Head Housekeeper | 3 |
| ISW | 1 |
| IDW | 3 |
| IDA | 5 |
| Maintenance Foreman | 0 |
| MH Coordinator | 1 |
| MRT | 0 |
| MRS | .5 |
| MRSS | 0 |
| Motor Truck Driver | 0 |
| Motor Equipment Repairman | 0 |
| MR OTA | 0 |
| Principal Clerk | 0 |
| Recreation Therapist | 0 |
| Senior Clerk/Steno | 0 |
| Senior Clerk/Typist | 0 |
| Senior Social Worker | 0 |
| Special Services Assistant | · 1 |
| Speech Therapist | 1 |
| Staff Psychologist | 0 |
| Total | 26.5 |

WRENTHAM STATE SCHOOL

| Position Considered for Reduction | Number of Permitted Reductions |
|---|---|
| Assistant Staff Psychologist | 0 |
| Campus Police | 0 |
| Community Mental Health Nursing Advisor | 0 |
| DCDS | 0 |
| Director of Education & Training | 0 |
| Head Nurse | 0 |
| IDA | 5 |
| IDW | 2 |
| ISW | 0 |
| Junior Clerk Typist | 0 |
| LPN | 0 |
| MRA | 0 |
| MRS | 0 |
| MRSS | 0 |
| MRT | 0 |
| Nursing Instructor | 0 |
| Occupational Therapist | 1 |
| Principal Psychologist | 0 |
| Recreational Therapist | 0 |
| Rehab. Counselor | 0 |
| Senior Clerk Typist | 0 |
| Senior Vocational Instructor | 0 |
| Speech Therapist | 0 |
| Special Services Assistant | 0 |
| Staff Clinical Social Worker | 0 |
| Staff Psychologist | 0 |
| Supervisor of Institutional Housekeeping | 0 |
| Supervisor of Volunteer Services | 0 |
| Telephone Operator | 1 |
| Ward Aide | 2 |
| Waste Treatment Plant Operator | 1 |
| Senior Social Worker | 0 |
| Mechanical Handyman | 0 |
| Total | 12 |

PAUL A. DEVER STATE SCHOOL

| Position Considered for Reduction | Number of Permitted Reductions |
|---|---|
| Assistant Staff Psychologist | 4 |
| Day Care Development Specialist | 2 |
| Director of Education & Training | 1 |
| Functional Unit Director | 1 |
| Hospital Supervisor, G. N. | 0 |
| IDA | 0 |
| IDW | 2 |
| Recreation Therapist | 0 |
| Semi-Senior Accountant | 1 |
| Special Services Assistant | 2 |
| Staff Clinical Social Worker | 1 |
| Supervisory Institutional Housekeeper | 10 |
| Unit Clothing Manager | 13 |
| Total | 37 |